[Civ. No. 28699. Second Dist., Div. Two. Jan. 7, 1965.]

COUNTY OF LOS ANGELES et al., Petitioners, v. GORDON T. NESVIG, as Clerk of the Board of Supervisors, etc., Respondent.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

Harold W. Kennedy, County Counsel, George W. Wake-field, Chief Assistant County Counsel, Joel R. Bennett and William J. Birney, Deputy County Counsel, O'Melveny & Myers and Howard J. Deards for Petitioners.

Knapp, Gill, Hibbert & Stevens and Joseph C. Gill for Respondent.

FLEMING, J.—Original petition for writ of mandate to compel the Clerk of the Board of Supervisors of Los Angeles County to publish a notice inviting bids on the Music Center theatre and forum ground lease, pursuant to resolution of the board of supervisors.

Petitioners are: (1) the County of Los Angeles; (2) the Theatre and Forum Lease Company; and (3) the Music Center Operating Company. The notice invites bids for the construction and lease of buildings on land owned by the county in the Los Angeles Civic Center and set aside for use as a place of public assembly, known as the Music Center.

The real property used for the Music Center was acquired by the county, in part by purchase from the City of Los Angeles, and in part by condemnation. That purchased from the city was acquired "for county purposes." That obtained by condemnation was acquired "for a public use, i.e., for construction and maintenance thereon of public buildings and grounds and general County use."

The cost of the buildings in the Music Center is being financed by a combination of private contributions and of county moneys in the form of annual rentals through the use of the lease and lease-back device.

The first phase of construction, now completed, consisted of a garage and opera house, known as the Music Center Memorial Pavilion. In this phase the county leased real property to the Music Center Lease Company (not involved in this proceeding), the latter constructed a garage and pavilion on the site, and leased back the improved property to the county at an annual rental of $845,000 for 30 years.

The county also contracted out the operation and management of all facilities of the Music Center, existing and future, to a private nonprofit corporation, petitioner Music Center Operating Company, which under an agreement entitled an operating sublease undertook for a period of 40 years to operate and manage all activities at the Music Center on behalf of the county.

The second phase of construction at the Music Center site will consist of two smaller buildings of public assembly to be known as the theatre and the forum. On May 29, 1961, the county contracted for architectural plans for the proposed theatre and forum, which plans have now been completed and approved by the board of supervisors. The county proposes to invite bids on the theatre and forum ground lease, under which the county will lease the land to the successful bidder, who will construct a theatre and forum on the site in accordance with the architect's plans, and lease back the improved property to the county for 30 years at an annual rental not to exceed $100,000.

On August 18, 1964, the board of supervisors directed its clerk to publish a notice inviting bids for this lease, pursuant to Government Code, sections 6066 and 25351.3, subdivision (c). Petitioner Theatre and Forum Lease Company, a nonprofit corporation, proposes to bid on the ground lease. However, the clerk of the board of supervisors purportedly refuses to publish the notice inviting bids, on the

ground that the proposed ground lease and the Music Center operating contract are, or may be, invalid and in excess of the powers of the county.

Petitioners assert this is a proper case for the issuance of an original writ by this court in that (a) an important question of public law is involved, specifically the validity of lease and lease-back arrangements for public assembly and entertainment facilities; and (b) speed of decision is essential in that the sooner the Music Center is completed the less will be the cost to the county taxpayers. Petitioners ask this court to declare that the theatre and forum ground lease and the Music Center operating contract are valid, binding contracts, and to issue its mandate requiring the clerk to publish the notice inviting bids.

Respondent demurred generally to the petition, arguing that the proposed ground lease and the operating contract violate the California Constitution and state law, and asking that both be declared void as against public policy.

*Original Mandamus*

Petitioners did not apply to the superior court for the relief which they seek but instead brought an original proceeding for writ of mandate in the District Court of Appeal. ■ The Los Angeles Superior Court has full power to grant such petitions and pass on all issues in the case, and attempts by litigants to bypass courts of original jurisdiction are not ordinarily favored. ■ In the absence of exceptional circumstances petitioners will normally be relegated to their remedies in the court of general jurisdiction.

■ However, the circumstances of this case appear sufficiently exceptional to justify an original application for the writ to this court. (1) In previous litigation the County of Los Angeles brought the contracts relating to the lease and lease-back and operation of the Music Center pavilion before the Los Angeles Superior Court and obtained a judgment upholding the validity of these contracts. In a practical sense a trial court ruling has already been obtained, which petitioners now seek to confirm in an appellate court. (2) The Music Center is in actual operation with existing overhead and expenses, but with revenues whose full potential will not be realized until the balance of the project is completed. (3) A main tenant of the Music Center, the Los Angeles Civic Light Opera Association, needs more time than can be allotted to it in the pavilion and is being forced to operate at additional expense until the theatre is completed.

The circumstance of a project half-built and partly in operation brings an urgency to petitioners' application for original relief which justifies avoiding the court of original jurisdiction in this instance. Accordingly, we proceed to the merits.

*The Ground Lease*

Lease and lease-back contracts have been upheld by the Supreme Court on numerous occasions running from *City of Los Angeles* v. *Offner,* 19 Cal.2d 483 [122 P.2d 14, 145 A.L.R. 1358], *Dean* v. *Kuchel,* 35 Cal.2d 444 [218 P.2d 521], *County of Los Angeles* v. *Byram,* 36 Cal.2d 694 [227 P.2d 4], to *Corona Unified Hospital Dist.* v. *Superior Court,* 61 Cal.2d 846 [40 Cal.Rptr. 745, 395 P.2d 817].

Nevertheless the attack is again made on this type of arrangement on the ground that it is a mere subterfuge for an installment contract for the purchase of a building by the county, for whose payment the county has incurred a liability without the two-thirds voter approval required by article XI, section 18, of the California Constitution:

"No county . . . shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, . . ."

The standards to be applied to lease and lease-back contracts were aptly set forth by the Supreme Court in *City of Los Angeles* v. *Offner,* 19 Cal.2d 483 [122 P.2d 14, 145 A.L.R. 1358]: "It has been held generally in the numerous cases that have come before this court involving leases and agreements containing options to purchase that if the lease or other agreement is entered into in good faith and creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year, no violence is done to the constitutional provision. (*McBean* v. *City of Fresno,* 112 Cal. 159 [44 P. 358, 53 Am.St.Rep. 191, 31 L.R.A. 794]; *Smilie* v. *City of Fresno,* 112 Cal. 311 [44 P. 556]; *Higgins* v. *San Diego Water Co.,* 118 Cal. 524, 553 [45 P. 824, 50 P. 670]; *Doland* v. *Clark,* 143 Cal. 176, 180, 181 [76 P. 958]; *Krenwinkle* v. *City of Los Angeles,* 4 Cal.2d 611, 613 [51 P.2d 1098].) If, however, the instrument creates a full and complete liability upon its execution, or if its designation as a 'lease' is a subterfuge

and it is actually a conditional sales contract in which the 'rentals' are installment payments on the purchase price for the aggregate of which an immediate and present indebtedness or liability exceeding the constitutional limitation arises against the public entity, the contract is void. (*Chester* v. *Carmichael*, 187 Cal. 287 [201 P. 925]; *In re City & County of San Francisco*, 195 Cal. 426 [233 P. 965]; *Mahoney* v. *City & County of San Francisco*, 201 Cal. 248 [257 P. 49]; *Garrett* v. *Swanton*, 216 Cal. 220 [13 P.2d 725].)''

*Offner* involved a lease of city-owned real property for a period of 10 years at a rental of $1.00 a month to a bidder who was to construct to specifications a rubbish incinerator on the real property, which would then be leased back to the city at a monthly rental to be specified in the bid. Title to the incinerator would remain in the bidder unless the city exercised an option to purchase. The court held that the contract would not create an immediate indebtedness for the entire amount and would not violate the debt limitation provision of the Constitution. The monthly rental payments were intended to represent the fair rental value of the incinerator for each month's use, the court said, and the city was not obligated under its contract to exercise its option to purchase the incinerator.

*Dean* v. *Kuchel*, 35 Cal.2d 444 [218 P.2d 521], presents facts which parallel those of the present case. In that case the state leased real property for a 35-year term to a private contractor, who agreed to construct an office building thereon and lease back the property and the building to the state for a 25-year term. If at the end of 25 years all covenants of the lease had been performed by the state, title to the property and building would vest in the state, and in any event full title would vest in the state at the end of 35 years. In upholding the validity of the transaction the court pointed out that a lease which provides for the payment of rentals from month to month does not create an immediate indebtedness for the entire amount of rentals but only for each installment of rent as it falls due in a particular month, and accordingly such a lease does not violate the constitutional provision against the state incurring debt without voter approval. (Art. XVI, § 1.) Although title to the property would vest in the state at the end of the lease period, this factor was not sufficient to transpose a valid lease into an installment purchase contract.

While conceding the force of the ruling in *Dean* v. *Kuchel*, respondent argues a difference in the present case, in that section 14 of the proposed theatre and forum ground

lease, in case of default in payment of rent by the county, permits reentry by the bidder and termination of the lease-back, or reentry by the bidder without termination of the lease-back and a re-lease of the premises for the account of the county. Respondent argues that these provisions effectively bind the county for the entire 30-year term of the lease-back and effectively preclude the county from repudiating its obligations under the lease (walking away from the lease) ; and that therefore the county has incurred an obligation of a more permanent nature than was true in *Offner* and *Kuchel.*

The gist of this argument seems to be that because the bidder can reenter and operate for the account of the county, the county is more firmly bound than if the bidder merely sued for rent at the end of each accrual period. We do not agree with this reasoning, for in the absence of any provision which would accelerate payment of the debt on default the obligation of the county remains precisely the same, *viz.,* to pay certain fixed annual rentals, whether the bidder reenters or not. Since public bodies have gone into bankruptcy in the past and could do so again in the future, we see no reason why a potential bidder cannot be given effective safeguards to guarantee his status as a secured creditor in the event of a default.

The argument that effective security provisions in a lease-back vitiate the contract was made and rejected in *Dean* v. *Kuchel.* In that case the state was required to pay rental under the lease-back for a period of 25 years but the lease to the contracting company ran for a period of 35 years. However, if at the end of 25 years the state had performed all its obligations, title to the property would immediately vest in the state. Obviously, the contracting company in that instance was to receive a 10-year cushion against default by the state in the payment of rent, during which additional period it could lease out the building to others in order to collect the agreed rentals. In upholding this provision the court sanctioned the right of the contractor to repossess the building on default, stating, ''[I]t is not to be supposed that provisions cannot be made for the effect of a breach of the lease by the state . . . It may well be that no builder could be obtained, or a higher price would be asked to the state's detriment if some measure of protection were not granted in case of default by the state. The state may prevent the occurrence of the contingency which would oust it from possession by performing under the lease.'' (35 Cal.2d at pp. 448-449 [218 P.2d 521].)

The provisions in section 14 of the ground lease for reentry on default are merely declaratory of the California law with respect to the remedies of a lessor in case of default by a lessee. (*Phillips-Hollman, Inc.* v. *Peerless Stages,* 210 Cal. 253 [291 P. 178]; *DeHart* v. *Allen,* 26 Cal.2d 829 [161 P.2d 453]; *Kulawitz* v. *Pacific etc. Paper Co.,* 25 Cal.2d 664 [155 P.2d 24].) In the event this right of reentry were exercised, either the lease-back would be declared terminated and the county's obligation to pay further rent would end, or the bidder would repossess the property and relet it for the county's account. In the latter event the county's obligation would continue to accrue from year to year in accordance with the contract and it would continue to receive the value of the use of the property from year to year in the form of credits against its obligation. As we read *Dean* v. *Kuchel, supra,* remedies which are available under California law to a landlord against a private tenant (*DeHart* v. *Allen,* 26 Cal.2d 829 [161 P.2d 453]; *Treff* v. *Gulko,* 214 Cal. 591 [7 P.2d 697]) may by contract be made applicable for use against a governmental tenant.

The second constitutional argument against the ground lease is that the statutory lease and lease-back device, while perhaps permissible, when used to carry out functions imposed on a county by law, is invalid for nonessential functions voluntarily undertaken by the county. Support for this proposition is supposedly found in *County of Los Angeles* v. *Byram,* 36 Cal.2d 694 [227 P.2d 4], where the court upheld a lease, lease-back contract for the construction of a court building for two reasons: (1) the debt limitation provision of the constitution does not apply to obligations imposed on a county by law (such as furnishing courtroom facilities), and (2) the lease agreement before the court did not violate the debt limitation provision of the constitution. Respondent argues that because in *Byram* the contract was upheld on two separate grounds, in some manner the two grounds have now become one and both have become essential to sustain a lease, lease-back contract. We do not follow this logic any more than we would follow the reasoning that a plane capable of flying on one engine, but which has two, can no longer fly because one engine has failed. Either ground by itself in the *Byram* case was sufficient to support the validity of the contract there involved. (*McClain* v. *County of Alameda,* 209 Cal.App.2d 73, 76 [25 Cal.Rptr. 660].) Nothing in the statutes or the decisions of our Supreme Court suggests that the use of the

lease, lease-back method is limited to the performance of obligations imposed by law on a public body. To the contrary the obligations in *Dean* v. *Kuchel, supra* (housing of office workers) and in *City of Los Angeles* v. *Offner*, 19 Cal.2d 483 [122 P.2d 14, 145 A.L.R. 1358] (rubbish disposal) appeared to be obligations voluntarily assumed.

 We conclude that the ground lease does not violate the constitutional debt limitation of article XI, section 18.

*Objections Based on Statute*

The leasing of county real property to private entities for the construction and subsequent lease-back of facilities for auditoriums, opera houses, and music halls is controlled by Government Code, sections 25351.3, 25351.35, and 25371.[1]

---

[1]Government Code § 25351.3: ''. . .

''(a) Acquire land for and construct, lease, sublease, build, furnish, refurnish or repair buildings for convention and exhibition halls, trade and industrial centers, *auditoriums, opera houses, music halls and centers, . . . and related facilities as places of public assembly* for the use, benefit and enjoyment of the public, . . .

''(b) *Acquire land and construct such buildings,* structures and facilities thereon in whole or in part, with county funds or it may, by contract or lease with any nonprofit association or corporation, provide for the acquisition of land or the construction of such buildings, structures and facilities, or all or any part thereof, for such public purposes, *upon such terms as the board may determine.*

''(c) *Lease,* pursuant to Section 25371 of this code, *any real property owned by the county* and available for such public purposes to any person, firm, corporation or nonprofit association or corporation for such purposes, or any thereof, such person, firm, corporation, or nonprofit association or corporation to lease the real property as improved back to the county for use for the purposes stated in the lease. *Any lease authorized by the board under this subdivision (c) shall be awarded to the lowest responsible bidder* after public competitive bidding conducted in the manner determined by the board. . . .''

§ 25351.35: ''*In the case of any contract or lease described in subdivision (b)* of Section 25351.3, obligating the county to make payments or incur obligations of one million dollars ($1,000,000) or more, *the board shall not enter into such contract or lease unless and until the board has submitted such contract or lease to the qualified electors of the county* at the next general election or at a special election to be called by the board for the purpose. . . .

''For the purposes of this section, all contracts or leases pertaining to one project shall be considered as one contract or lease.

''*This section shall not apply to any project for which the architectural contract has been executed prior to June 1, 1961.*''

§ 25371: ''Notwithstanding any other provision of law, the board of supervisors of any county is hereby authorized and empowered to let to any person, firm or corporation, for a term not to exceed 40 years, any real property which belongs to the county; *provided, that the use to which such property will be put, after construction thereon, is consistent with the use or purposes contemplated upon the original acquisition* of such property or to which such property has been dedicated. Any instrument by which such property is let as aforesaid shall require the

Respondent charges that petitioners have not complied with the requirement of section 25371, that the use to which the real property will be put [entertainment purposes] be consistent with the use contemplated on its original acquisition [general county purposes].

We see no inconsistency between the use of the real property as a music center and the use originally contemplated at the time of its acquisition. The board of supervisors in 1955 authorized the acquisition of the property for "constructing and maintaining thereon public buildings and grounds and for general County use" and "for County purposes." ■■■ The issue, therefore, is whether the use of premises as a music center falls within the classification of "general county use." We can pose the question more bluntly: is the operation of an opera house general county business? We think it is. (*Egan v. City & County of San Francisco*, 165 Cal. 576, 581-582 [133 P. 294, Ann. Cas. 1915A 754].) To us the issue appears conclusively settled by the specific terms of section 25351.3, in which the Legislature recognized opera houses, and music halls, and music centers as proper subjects of county endeavor, as it had previously sanctioned under section 25351 the construction of hospitals, courthouses, jails, museums, libraries, art galleries, exposition buildings, and sports arenas as useful activities in carrying out the work of county government. The Legislature has given counties the power to construct opera houses and music centers, and if a county chooses to exercise this power it is doing so for general county uses.

■■■ Next, respondent argues the invalidity of the proposed ground lease because it has not been approved at an election by a majority of the voters, as required by section 25351.35. To this contention there are two replies. First, section 25351.35 by its terms only applies to contracts under subdivision (b) of section 25351.3, whereas the county in this instance is proceeding under subdivision (c) of section 25351.3, a different subdivision. The Legislature provided

---

lessee therein to construct on the demised premises a building or buildings for the use of the county during the term thereof, shall provide that title to such building shall vest in the county at the expiration of said term and shall contain such other terms and conditions as the board of supervisors may deem to be in the best interests of the county. No county shall enter into any such contract if at the time 60 percent of the total payments which would become due from the county if all leases, including the contract to be let, entered into under the authority of this section, were to run their full term plus the total amount of county bonded indebtedness outstanding at said time exceeds the maximum bonded indebtedness of the county." (Italics added.)

alternative methods by which a county could act. ▮▮▮ Under subdivision (b) land can be acquired and buildings constructed by contract or lease (without specifying how this is to be done and without specifying public competitive bidding); under subdivision (c) only buildings can be constructed, the method is limited to a lease and lease-back, and competitive bidding is required. Presumably the Legislature felt that subdivision (b) was so broad (any type of contract or lease to acquire land or buildings without competitive bidding) that voter approval should be required, whereas it did not consider the same protection necessary under the more restrictive provisions of subdivision (c). ▮▮▮ Second, in any event section 25351.35 by its terms does not apply to projects for which the principal architectural contract has been executed prior to June 1, 1961. The architectural contract for the theatre and forum is dated May 29, 1961. Accordingly, the ground lease under consideration need not conform to section 25351.35, and approval by a majority of voters is not necessary in order to validate the contract.

▮▮▮ Finally, respondent, arguing that extensive recognition of the lease, lease-back device is eroding the pay-as-you-go principle implicit in the Constitution, asks us to disapprove the ground lease as a matter of public policy. This action we cannot consider, for the power to determine whether public improvements should be financed through long-term leases or on a cash basis is a function of the Legislature and the board of supervisors and not a function of the courts. (*Myers* v. *English,* 9 Cal. 341.)

## The Operating Contract

Under the authority of Government Code, section 25351.3, subdivision (d), the county contracted out the operation of the Music Center for a period of 40 years to the Music Center Operating Company.[2]

---

[2] § 25351.3, subd. (d): ''Enter into a lease or sublease, without advertising for bids therefore, of such buildings, structures and facilities or any thereof with any nonprofit association or corporation which agrees to use the buildings, structures and facilities so leased to it for the public purposes for which the same were or are to be built; or contract, without advertising for bids therefor, with any nonprofit association or corporation for the maintenance, operation and management, or any thereof, of such buildings, structures and facilities or any part thereof, including the scheduling and promotion of events therein, for a specified term, not to exceed forty (40) years, upon such terms and conditions as may be agreed upon. Such leases, subleases or contracts shall provide that at least annually there shall be paid to the county the net revenue, if any, from the operation and use of the facilities, remaining after the

Although the agreement between the county and the Music Center Operating Company is termed an operating sublease, is is in fact more nearly a management and operating contract. The facilities of the Music Center are turned over to the operating company for a period of 40 years but no rent is payable by the operator to the county for the premises. The agreement provides that after deduction of necessary costs, the net profits are to be turned over to the county. Likewise, the county is apparently responsible for any losses. The county is to furnish the utilities, maintain the buildings, perform all custodial and janitorial services, operate the garage, maintain the equipment used for staging and production, furnish all personnel to operate the Music Center (as opposed to personnel to manage the Music Center), and pay all taxes.

The operator agrees to keep proper books and accounts, to submit annual estimates of receipts and expenditures in connection with the preparation of the county budget, to submit its subleases for county approval, to submit its concession contracts for approval, to submit its admission prices and prices to be charged for nonadmission services such as meals and refreshments to the county for approval, to submit its rentals for short-term lease events for approval.

The operating contract is in skeleton form and declares that it will be revised and amended from time to time to provide more detailed specification of these matters as experience is gained in the operation of a new enterprise. Basically, however, it places the management of the Music Center in the hands of the operating company for a period of 40 years, subject to specified controls over prices and operation policies.

Respondent argues that the operating contract is an unlawful delegation by the county to a private group of its power to administer, operate, and maintain a public facility. ▉ The general rule is that while a public body may not delegate its power of control over public affairs to a private group, it may delegate the performance of administrative functions to such groups if it retains ultimate control over administration so that it may safeguard the public interest.

payment of expenses and costs, if any, for maintenance, operation or management, interest and principal payments upon loans to the non-profit corporation or association for purposes of maintenance, operation or management, and any other expenses, and after providing maintenance and operation reserves. Such lease, sublease, or contract shall also provide that upon its expiration, all of the assets of the nonprofit association or corporation after payment or discharge of its indebtedness and liabilities shall be transferred to the county.''

(*Sacramento Chamber of Commerce* v. *Stephens,* 212 Cal. 607 [299 P. 728].) In each case of delegation there are two issues, whether the function is a proper one for delegation, and whether the manner of delegation retains the necessary, ultimate control over administration in the hands of the public entity.

 Clearly, the operation and management of places of public assembly is an administrative function which may be delegated (*Egan* v. *San Francisco,* 165 Cal. 576, 584 [133 P. 294, Ann.Cas. 1915A 754]), so we turn to the second issue, whether ultimate control over the operation has been retained in the hands of the public body. As succinctly put by Sloss, J., in the *Egan* case, ''If the management of an opera house constitutes a public use, the public character of the use can exist only so long as the control is retained in the hands of some public agency.'' Powers which require the exercise of judgment and discretion, said Justice Sloss, must necessarily remain with the public agency and cannot be delegated. Thus the issue in each case of delegation is whether ultimate control over matters involving the exercise of judgment and discretion has been retained by the public entity. (*Egan* v. *City & County of San Francisco,* 165 Cal. 576 [133 P. 294, Ann.Cas. 1915A 754]; *City & County of San Francisco* v. *Ross,* 44 Cal.2d 52 [279 P.2d 529]; *Haggerty* v. *City of Oakland,* 161 Cal.App.2d 407 [326 P.2d 957].)

In the *Egan* and *Ross* cases the contracts were found wanting because the public body had failed to retain control over the prices to be charged for the facilities placed under private operation. In *Haggerty,* on the other hand, the lease of a convention hall and banquet building by the City of Oakland for operation by a private party was found to be a valid exercise of city power under proper controls, since under the lease the city retained the right to control the use of the premises for convention or banquet purposes and to control the prices, charges, subleases, and practices of the lessee.

The Music Center operating contract, as we interpret it, retains ultimate control by the county over the operation of the Music Center in all matters involving the exercise of judgment and discretion. The county has ultimate control over long-term subleases; admission prices; concessions; short-term sublease rentals and admission prices; food and refreshment prices and service charges; and over the operator's annual budget. This control distinguishes the present case from the

*Egan* and *Ross* cases, and brings it within the rule of the *Haggerty* case.

## Public Policy

Finally, respondent asks us to disapprove the operating contract on the ground of public policy, because it runs for a term of 40 years during which the county is without safeguards or remedies in the event of unsatisfactory performance by the Music Center Operating Company.

Concededly, 40 years is an extraordinarily long term for a management contract professedly made to acquire the special competence of the members of the board of directors of the operating company, few, if any, of whom will be alive at the end of the contract period. We do not know why a period of 40 years was selected. In *Haggerty* the term of the operating contract was 10 years; in *City of Oakland* v. *Williams,* 206 Cal. 315 [274 P. 328], 10 years; in *McBean* v. *City of Fresno,* 112 Cal. 159 [44 P. 358, 53 Am.St.Rep. 191, 31 L.R.A. 794], five years; in *Sacramento Chamber of Commerce,* less than one year. Yet, although it is interesting to speculate on these matters, their superintendence has not been committed to our charge. ▇▇ We are not guardians of public policy in matters involving the exercise of administrative judgment nor are we authorized to review the merits of specific contracts that come before us other than to see that their provisions conform to the constitution and to the statutes. ▇▇ Public policy in the operation of county facilities is committed to the board of supervisors, on whom rests the primary obligation to safeguard the public interest in fiscal matters and public administration. We neither approve nor disapprove the operating contract on the ground of public policy. Such matters are not within our province.

With respect to the absence of termination privileges, we observe that our present approval of the operating contract does not mean that everything in it will be approved automatically by the courts during the next 40 years, or that the contract is as immutable to change as the law of the Medes and the Persians. The operating contract, like other contracts, is subject to interpretation in the light of its development, to further analysis in the light of experience, and to modification and change in the light of performance. The parties themselves recognize that the operating contract merely outlines a general theme which will necessarily acquire rhythm and harmony in the process of orchestration. In future years should the melody of the operating company wander off key

and the notes turn flat, we do not believe the county must necessarily remain a captive audience to dissonance and discord. Any contract is subject to termination for unsatisfactory performance. The usual remedies for the discharge of a contract for breach, for nonperformance, or for failure of consideration, will always be available to the county. We trust the sense of harmonics of all concerned will prevent such dissonance from ever interrupting the counterpoint of public and private song in a most worthy civic duet.

The demurrer is overruled. The writ of mandate may issue.

Herndon, Acting P. J., and Kincaid, J. pro tem.,* concurred.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.