[Civ. No. 9101.   Fourth Dist., Div. One.   Nov. 21, 1968.]

FREDRICK J. RUANE, Plaintiff and Appellant, v. CITY
OF SAN DIEGO et al., Defendants and Respondents.

Davies, Barwick & Knowlton and Robert W. Knowlton for Plaintiff and Appellant.

Edward T. Butler, City Attorney, Brian J. Newman-Crawford and C. M. Fitzpatrick, Deputy City Attorneys, for Defendants and Respondents.

COUGHLIN, J.—Plaintiff, a taxpayer, appeals from a judgment denying injunctive and declaratory relief premised on the alleged invalidity of certain phases of the acquisition and operation of a transportation system by defendant, a chartered city.

The case was tried upon an agreed statement of facts dated March 22, 1967, and three amendments thereto dated, respectively, April 12, 1967, June 14, 1967, and September 14, 1967.

The parties to the transaction which is the subject of the instant controversy, are the defendant, the City of San Diego; San Diego Transit System, a corporation, hereinafter referred to as System, which operated a transportation business in the City of San Diego, furnishing urban transportation and charter bus transportation; San Diego Transit Corporation, hereinafter referred to as Transit Corporation, a nonprofit corporation, formed and wholly owned by City; and San Diego Transit Leasing Corporation, hereinafter referred to as Leasing Corporation, a nonprofit corporation incorporated by the members of the Board of Directors of Transit Corporation, none of whom are city officials or employees.

In 1966 City proposed a program for the acquisition and operation of a municipal transportation system to be financed by a federal grant, private funds and a special tax; initiated negotiations for the acquisition of all of the assets of System; applied for a grant of federal funds under the Urban Mass Transportation Act of 1964; instituted proceedings to cause the adoption of a charter amendment empowering it to levy a special tax and engage in specifically described appropriate action; and authorized the formation of two nonprofit corporations to effect the proposed acquisition and operation.

On June 7, 1966, the electorate of the City of San Diego, by majority vote, approved a charter amendment which became effective June 29, 1966; was known as section 77b; authorized the levy of a special tax, in addition to all other taxes provided for in the charter, "to be used for discharging any obligations undertaken by the City to acquire, develop, operate or maintain a public transportation system or to assist a nonprofit corporation to acquire, develop, operate or maintain a public transportation system"; empowered the city counsel to execute contracts, acquire property by purchase or lease, and to do other specified acts "in order to provide, promote or preserve a public transportation system"; and provided the powers enumerated "shall not be limited by any other provisions of this Charter."

Proceeds from the special tax are placed in the transportation fund of the city.

By written agreement System agreed to sell to City a part of its assets, consisting of real property, materials, supplies, used automobile parts and assemblies, for the sum of $1,696,000, which City agreed to pay; and further agreed to sell to Leasing Corporation the remainder of its assets consisting of regular service motor coaches, charter service motor coaches, service automobiles, other vehicles, office furniture, shop and other miscellaneous equipment, for the sum of $2,270,500, which Leasing Corporation agreed to pay.

City's application for a federal grant was approved. Thereupon City and the federal government executed an appropriate contract assuring use of the grant to effect the proposed program. A part of the grant and tax funds were used to pay for the real property and other assets City agreed to purchase from System.

Leasing Corporation borrowed $3,000,000 from a bank; executed a debt agreement with the bank; and used a part of the loan in payment of the motor coaches, automotive equipment and other assets it agreed to purchase from System.

City rented from Leasing Corporation the motor coaches and other property the latter acquired from System; executed a written lease evidencing the transaction, which provided for payment semi-annually of a specified rental and transfer to City of title to the rental property upon satisfaction of Leasing Corporation's obligation to the bank; entered into a contract with Transit Corporation under which the latter would be responsible for operation and management of the transportation system City acquired through purchase and rental; and agreed to pay Transit Corporation for the services rendered under this contract.

System operated both the urban transportation business and a charter bus business. Transit Corporation has continued this dual operation.

Plaintiff's contentions, as asserted in his complaint and on appeal, are that: (1) The amendment to the charter adding section 77b is ineffective insofar as it purports to authorize the levy of a special tax in aid of public transportation because it was not adopted by a two-thirds vote, which he claims was required by section 76 of the charter; (2) City violated article XI, section 18 of the State Constitution because, in executing the acquisition agreements and federal grant contract, it incurred an indebtedness and liability which exceeded its annual income for that year, and did not

obtain approval by two-thirds of the voters; (3) acquisition of the transportation system was illegal because at the time thereof the auditor had not certified the money required for such acquisition was in the treasury to the credit of the appropriation from which it was to be drawn as required by section 80 of the City Charter; (4) City does not have the power to acquire, own and operate a charter bus business as distinguished from an urban mass transit business; and (5) section 77b authorizes a special tax only for ''public transportation'' purposes, which does not include a charter bus purpose.

The charter of the City of San Diego may be amended by the affirmative vote of a majority of the qualified voters voting on the amendment. (Cal. Const., art. XI, § 8, Stats. 1931, ch. 47, § 223, p. 2936.) The addition of section 77b was such an amendment. Plaintiff's contention the special tax levy authorized by this section requires approval by two-thirds of the electorate, is premised on the provisions of section 76 of the charter which imposes a tax limit and declares, in pertinent part: ''No special tax shall be permitted except as expressly authorized by this Charter'' and ''. . . no increase over said limits, except as in this Charter prescribed shall be made in any fiscal year unless authorized by ordinance adopted by the vote of two-thirds of the electors of this City voting on the proposition. . . .'' (Stats. 1931, ch. 47, § 76, p. 2890.) Plaintiff asserts section 76 prohibits the imposition of a special tax without the approval of two-thirds of the voters, but fails to show how the foregoing provisions support his position. Dictating a contrary conclusion is the fact: (1) The tax authorized by section 77b is not within the special tax proscribed by section 76 because it is a special tax ''expressly authorized by this Charter''; (2) there is no showing the special tax authorized by section 77b will increase the limit of taxation imposed by section 76; (3) this tax limit applies only to the general tax and not a special tax (see *City of Grass Valley* v. *Walkinshaw,* 34 Cal.2d 595, 599-602 [212 P.2d 894]); (4) even assuming the section 77b special tax is within the tax limit proscribed by section 76 and will effect an increase in the tax limit, section 77b amends section 76 to the extent there is any conflict; and (5) section 77b expressly declares: ''The enumerated powers in this section . . . shall not be limited by any other provisions of this Charter.'' Section 77b is a valid exercise of the electoral power authorizing levy of a special tax for the purpose therein stated.

■ Plaintiff's contention execution of the acquisition agreements violated article XI, section 18 of the state Constitution is premised on the claim the obligation of the City under the lease is an indebtedness or liability for the total amount of the rentals therein agreed to be paid, which was incurred in the year the lease was executed rather than in the year when the respective rental payments are due; and the sale, loan and leasing arrangement between System, City, Leasing Corporation and the bank was a subterfuge whereby City, as such, acquired ownership of the transportation business of System without obtaining approval of two-thirds of the voters.

The third amendment to the Agreed Statement of Facts, which is dated September 14, 1967, states if the total amount to be paid under the lease as rent "is construed to be a present obligation of the City, then the two-thirds vote requirements of Article 11, Section 18 of the California State Constitution must be met."

■ The rule of law applicable to the instant situation is stated in *City of Los Angeles* v. *Offner*, 19 Cal.2d 483, 485 [122 P.2d 14, 145 A.L.R. 1358], as follows: "It has been held generally in the numerous cases that have come before this court involving leases and agreements containing options to purchase that if the lease or other agreement is entered into in good faith and creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year, no violence is done to the constitutional provision. [Citing cases.] If, however, the instrument creates a full and complete liability upon its execution, or if its designation as a 'lease' is a subterfuge and it is actually a conditional sales contract in which the 'rentals' are installment payments on the purchase price for the aggregate of which an immediate and present indebtedness or liability exceeding the constitutional limitation arises against the public entity, the contract is void. [Citing cases.]"

■ City's monetary obligation under the lease was to pay $2,206,000 concurrently with execution of the lease, as prepaid rental, and the further sum of $360,000 on every January 15th and July 15th during the term of the lease, which was for the period from July 1, 1967 through May 31, 1972. There is no acceleration clause. Upon default the maximum obligation of City remains the same, i.e., to pay the designated semi-annual payments. (See *County of Los*

*Angeles* v. *Nesvig,* 231 Cal.App.2d 603, 611 [41 Cal.Rptr. 918].) The semi-annual rental is not payable until the due date. No indebtedness or liability therefor arises until that date. The consideration for each rental payment is the right to possess and use the leased property during the subsequent six-month period. Leasing Corporation agrees to transfer ownership of the leased property to City when the former satisfies its obligation to the bank, a condition wholly unrelated to City's liability to pay rental. In all substantial aspects the lease conforms to those upheld against constitutional attack in *County of Los Angeles* v. *Byram,* 36 Cal.2d 694, 700 [227 P.2d 4], *Dean* v. *Kuchel,* 35 Cal.2d 444, 446 [218 P.2d 521], *City of Los Angeles* v. *Offner, supra,* 19 Cal.2d 483, 485, *McBean* v. *City of Fresno,* 112 Cal. 159, 164, 167 [44 P. 358], *County of Los Angeles* v. *Nesvig, supra,* 231 Cal.App.2d 603, 609, 616, and *City of La Habra* v. *Pellerin,* 216 Cal.App.2d 99, 101 [30 Cal.Rptr. 752].

City's method of acquisition and operation of the transportation system without approval of two-thirds of the voters is not invalid because Leasing Corporation agreed to transfer ownership of the buses and other property acquired by it to City upon satisfaction of its obligation to the bank (*Dean* v. *Kuchel, supra,* 35 Cal.2d 444, 447; *City of Los Angeles* v. *Offner, supra,* 19 Cal.2d 483); the method of acquisition was through a nonprofit leasing corporation created at the instance of City (*Corona etc. Hospital Dist.* v. *Superior Court,* 61 Cal.2d 846, 853 [40 Cal.Rptr. 745, 395 P.2d 817]; *County of Los Angeles* v. *Nesvig, supra,* 231 Cal.App.2d 603; *City of La Habra* v. *Pellerin, supra,* 216 Cal.App.2d 99, 101); City agreed to levy a tax authorized by section 77b of the charter to provide funds from which to pay the rentals; or the lease was assigned to the bank as security for money loaned to Leasing Corporation.

Contrary to plaintiff's contention, there is nothing in the debt agreement or the leasing agreement, even though each incorporates the other, which obligates the city to the bank for the loan to Leasing Corporation.

Plaintiff's contention the federal grant contract violates the constitutionally prescribed debt limit provision is premised on the claim it committed City to the payment of $9,465,000 for the transportation program outlined in that contract, which included the cost of acquisition, improvements, replacements and operating deficits. The contract, insofar as it relates to the expenditure of money, merely

assures the federal government City intends to carry out its proposal to acquire, maintain and operate a transportation system; does not purport to prescribe the method of acquisition, maintenance or operation, or foreclose the method adopted by City, which does not involve incurring an indebtedness in excess of current income and revenue.; and, although containing an agreement by City to ''provide'' funds in an amount sufficient ''to assure payment of the actual Net Project Cost,'' does not prescribe the manner by which the City shall ''provide'' such funds or, except negatively, the source of those funds.

The electorate of the City of San Diego, by a vote of 57 percent of those voting, conferred upon the city council, for the purpose of establishing a public transportation system, the power to execute contracts, to acquire property by purchase or lease; and to levy a special tax to be used to discharge any obligation incurred by the City either to acquire and operate or assist a nonprofit corporation to acquire and operate such a system. The method of acquisition and operation adopted by the city council conforms to the powers conferred; effects the purpose of the charter amendment; and does not violate the debt limit provisions of the Constitution, the object of which is to proscribe incurring an indebtedness in one fiscal year that will be an obligation against the general funds of the city for future years, unless two-thirds of the electorate approve. (*City of Palm Springs* v. *Ringwald,* 52 Cal.2d 620, 627 [342 P.2d 898] ; *McBean* v. *City of Fresno,* *supra,* 112 Cal. 159, 164 [44 P. 358].)

Approval of the federal grant application and execution of the grant contract occurred sometime in June 1967. Execution of the purchase, debt and lease agreements occurred on June 30, 1967. Each of these occurrences followed execution of the original agreed statement of facts on March 27, 1967, which, among other things, sets forth the provisions of section 80 of the City Charter that no ''contract agreement, or other obligation involving the expenditure of money out of appropriations made by the Council shall be entered into . . . unless the Auditor and Comptroller shall first certify'' the amount required therefor ''is in the treasury to the credit of the appropriation from which it is to be drawn and that it is otherwise unencumbered''; and states, ''There does not *now* exist sufficient money in the City Treasury, otherwise not. encumbered, available for use to the credit of an appropriation in order to purchase the System . . . and to make the improvements, replacements and payments for operating defi-

cits contemplated in the Federal grant applications.'' (Italics ours.) Implicit in this statement is the fact the auditor and comptroller, on or before March 22, 1967, had not made the certifications, if any, required by section 80 of the Charter. What has occurred since March 22, 1967, does not appear in the record. ▉ The subsequent amendments to the agreed statement did not refer to the matter. City has attached to its brief copies of the required certifications. However, these were not presented to the trial court; are not a part of the record; and may not be considered on appeal. (*People* v. *Shroyer,* 203 Cal.App.2d 478, 484 [21 Cal.Rptr. 460] ; *Bank of America* v. *Dowdy,* 186 Cal.App.2d 690, 695 [9 Cal.Rptr. 779].) ▉ On the other hand, it satisfactorily appears that at the time of execution of the purchase and lease agreements City had received sufficient money under the federal grant and from the section 77b tax levy to pay the amount specified for acquisition of the real property and other assets System agreed to sell to City, and the rental prepayment required by the lease.

Plaintiff's contention the federal grant contract and acquisition agreements violated section 80 of the charter is premised on the claim City was contractually committed to complete the transportation system project requiring expenditures for acquisition, improvements, replacements and operating deficits; upon the unavailability of money in the treasury as set forth in the agreed statement; and upon the claimed fact the auditor and comptroller had not made the prescribed certification.

Plaintiff's arguments in support of his position are premised on a misconception of the facts in the case and the law in the premises. The agreed statement of facts establishes only there was no certification on file at the time the original thereof was executed, i.e., March 22, 1967, rather than at the time the contracts and agreements in question were executed, i.e., June 1967. There is no showing the prescribed certification was not on file at the latter time. As a consequence, plaintiff's contention is premised on an unproven fact, i.e., a lack of the prescribed certification. In addition, as heretofore noted, the federal grant contract did not obligate City to the expenditure of money out of the city treasury even though it contemplated some of the funds City agreed to ''provide'' might come from the city treasury. Furthermore, the power conferred by charter section 77b to execute contracts, acquire property by purchase or lease and dispose of funds, as stated therein, ''shall not be limited by any of the provisions of this Charter.''

Plaintiff's contention City does not have power to engage in a charter bus business is premised on the concept its power is limited by the provisions of section 77b to the acquisition and operation of a "public transportation system" which, he claims, does not include the acquisition and operation of charter buses.

City's authority to acquire and operate a charter bus business is not dependent upon the grant of power conferred by section 77b and, thus, is not limited by that section. A charter city "has all powers over municipal affairs, otherwise lawfully exercised, subject only to the clear and explicit limitations and restrictions contained in the charter." (*City of Grass Valley* v. *Walkinshaw, supra,* 34 Cal.2d 595, 598.) Limitations and restrictions upon such powers must be expressly stated in the charter and may not be implied. (*Ibid.*) When the exercise thereof is questioned the issue is not whether the charter grants the power, but whether the charter limits or restricts the power. (*West Coast Adver. Co.* v. *San Francisco,* 14 Cal.2d 516, 521 [95 P.2d 138].) The enumeration of powers in the charter "does not constitute an exclusion or limitation." (*City of Grass Valley* v. *Walkinshaw, supra,* 34 Cal.2d 595, 599.) The operation of a transportation system is a municipal affair. (Art. XI, § 19, Cal. Const.; *In re Orosi Public Utility Dist.,* 196 Cal. 43, 55 [235 P. 1004]; *Mullins* v. *Henderson,* 75 Cal.App. 2d 117, 129 [170 P.2d 118].) Thus, independently of any grant in its charter, City had the power to acquire and operate such a system. However, the assumed existence of the power is confirmed by its charter which declares City "shall have all municipal powers . . . now or hereafter authorized to be granted to municipal corporations by the Constitution and laws of the State of California." (Stats. 1931, ch. 47, § 1, p. 2840.) The state Constitution expressly confers on all municipal corporations the power to "establish and operate public works for supplying its inhabitants with . . . transportation . . . ," and to "furnish such services to inhabitants outside its boundaries. . . ." (Art. XI, § 19, Cal. Const.)

As a consequence, the issue at hand is whether the operation of a charter bus business as part of a transportation system consisting primarily in the operation of an urban mass transit bus business is a municipal affair.

The charter bus business in question is defined in the agreed statement of facts as the operation of buses not regularly scheduled as to time or route; under a contract between the operator and an individual or group of individuals exclu-

sively for a specified journey; upon such terms as the parties may agree; and without geographical limits. System operated such a charter bus business in conjunction with its urban mass transit business at the time City and Leasing Corporation acquired its assets. The method of supplying transportation is not limited by the charter; includes services supplied by a charter bus as well as by an urban mass transit bus; and is no less a municipal affair because the bus operates outside the boundaries of the city or benefits nonresidents as well as residents. (Art. XI, § 19, Cal. Const.; *City of Mill Valley* v. *Saxton,* 41 Cal.App.2d 290, 292 [106 P.2d 455]; *Durant* v. *City of Beverly Hills,* 39 Cal.App.2d 133, 136 [102 P.2d 759].) The power of City to acquire and operate a charter bus business as a part of the transportation business acquired by System is both inherent and conferred by the charter through incorporation of the constitutional grant.

However, the issue whether the acquisition and operation of a charter bus business is within the power to acquire and operate a "public transportation system" is pertinent to the question whether City may use the special tax authorized by section 77b for the acquisition and operation of a charter bus business, because the authorization is limited to the levy of a tax to be used for discharging obligations undertaken in connection with a "public transportation system."

Plaintiff contends City's charter bus business does not have the characteristics of a common carrier, such as the duty to serve all who request service, and an operation with fixed fares, routes and schedules; for this reason is a private carrier rather than a public carrier; and, as a consequence, is not a part of the "public transportation system" to which section 77b applies. This conclusion is based upon the false premise, among others, that, for the purpose at hand, a carrier that is not a "common carrier" is a "private carrier" and not a "public carrier." In support of his position plaintiff relies upon decisions in tort cases considering the difference between the obligations of different types of carriers to their passengers in which, for this purpose, two types of carriers are distinguished by identifying one as a "common carrier" and the other as a "private carrier." The classification of these two types of carriers is limited to the purpose for which the distinction was made. The basis for the distinction has no application to a determination whether a carrier is being operated by and for the public as part of a public transportation system. Even assuming the premise a charter bus business

of the type operated by City does not have the characteristics of a common carrier and for this reason is a private carrier, plaintiff's conclusion it may not be a part of a "public transportation system" is without support in fact or law. The agreed statement lists nine charter cities in California operating a charter bus system as part of a public transportation system. It is economically advantageous to operate charter buses in conjunction with urban mass transit buses. As heretofore noted, City was empowered to acquire and operate the charter bus business which System operated as part of its transportation system. This power was not limited by section 77b. The authority conferred by that section to levy a tax to acquire and operate a public transportation system impliedly included within its scope whatever transportation system City independently had the power to acquire and operate. (Gen. see *City of North Sacramento* v. *Citizens Utilities Co.,* 192 Cal.App.2d 482, 487 [13 Cal.Rptr. 538]; *City of Salinas* v. *Pacific Tel. & Tel. Co.,* 72 Cal.App.2d 494, 504 [164 P.2d 905]; *City of Mill Valley* v. *Saxton, supra,* 41 Cal.App.2d 290, 293.)

The judgment is affirmed.

Brown (Gerald), P. J., and Whelan, J., concurred.

A petition for a rehearing was denied December 6, 1968, and appellant's petition for a hearing by the Supreme Court was denied January 15, 1969.