[No. D025921. Fourth Dist., Div. One. July 30, 1996.]

CITY OF SAN DIEGO et al., Plaintiffs and Respondents, v.
RICHARD RIDER et al., Defendants and Appellants.

1474

## Counsel

Carl Fabian, Eric Norby and Lewis A. Wenzell for Defendants and Appellants.

Jonathan M. Coupal as Amicus Curiae on behalf of Defendants and Appellants.

John W. Witt, City Attorney, Casey G. Gwinn, Assistant City Attorney, Luce, Forward, Hamilton & Scripps, Charles A. Bird and Thomas A. May for Plaintiffs and Respondents.

Seltzer, Caplan, Wilkins & McMahon, Brian T. Seltzer, Virginia C. Pearson and Julie P. Dubick as Amici Curiae on behalf of Plaintiffs and Respondents.

## Opinion

**HALLER, J.**—In this case we determine whether a lease-back financing arrangement to fund improvements to San Diego Jack Murphy Stadium (stadium) is valid. Under this arrangement, (1) the Public Facilities Financing Authority of The City of San Diego (agency) will lease the stadium from The City of San Diego (city), construct the improvements to the stadium and finance the construction by selling bonds to the public; (2) the city will then lease the improved stadium back from the agency pursuant to a "facility lease"; and (3) the agency will repay bondholders from rent the city pays under the facility lease. The financing arrangement is being effected without a vote of the electorate.

California Constitution, article XVI, section 18 (hereafter article XVI, section 18), prohibits the city from "incur[ring] any indebtedness . . . exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors . . . ." Under

Supreme Court authority referred to as the *Offner-Dean* rule, a public entity may incur contractual liability without voter approval and not offend the constitutional debt limitation if the contract "creates no immediate indebtedness for the aggregate installments, . . . . confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year . . . ." (*City of Los Angeles* v. *Offner* (1942) 19 Cal.2d 483, 486 [122 P.2d 14, 145 A.L.R. 1358], quoted in *Dean* v. *Kuchel* (1950) 35 Cal.2d 444, 446 [218 P.2d 521].)

Our task is to determine whether the financing arrangement here falls within the *Offner-Dean* rule.[1] We are satisfied it does. We reject appellants' alternative contention that the Supreme Court's recent opinion in *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1 [2 Cal.Rptr.2d 490, 820 P.2d 1000] should be interpreted as a signal that our high court has adopted a new and less friendly attitude toward *Offner-Dean*.

Accordingly, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1965, the voters of the city adopted a charter provision giving the city power to build and maintain a stadium. (San Diego City Charter art. VII, § 99.1.) The stadium has been operating since 1967 as home to the San Diego Chargers National Football League football team and the San Diego Padres National League baseball team as well as host to other events by way of leases granting tenants a nonexclusive right to use the stadium.

In 1995, the city entered into an agreement with the Chargers (the 1995 agreement) under which the Chargers agree to lease the stadium through 2020 and the city agrees to (1) improve the stadium for the 1997 professional football pre-season[2] and (2) build an offsite practice facility and office space for the 1996 professional football pre-season. The city sought assistance with the improvements from the agency.

The agency is a joint exercise of powers agency created in 1991 by the city and the Redevelopment Agency of The City of San Diego (redevelopment agency). The joint powers agreement provides the agency is "a public

---

[1]In the briefs before this court and the trial court, the parties express strong views on whether the decision to improve the stadium was a good one. The wisdom of that decision is not before us. Rather, our responsibility is to determine whether the mechanism selected to finance the project complies with the law. (*Max Factor & Co.* v. *Kunsman* (1936) 5 Cal.2d 446, 454-455 [55 P.2d 177].) Accordingly, we limit our review to that determination.

[2]The project includes expanding seating capacity from 60,818 to 71,000 (including 7,800 new club seats and 29 new sky boxes) and adding 2 new scoreboards.

entity separate" from the city and redevelopment agency and its "debts, liabilities and obligations . . . [do] not constitute debts, liabilities or obligations" of the city or redevelopment agency. The agency has the power to issue bonds to "rais[e] the funds necessary to carry out its purposes . . . ."

*Financing Structure*

In January 1996, the city and agency approved a financing arrangement to fund the stadium improvements. The arrangement includes a ground lease, bond issuance, and a facility lease. Under the ground lease, the city will lease the stadium to the agency. As an obligation of the ground lease, the agency will build the improvements required by the 1995 agreement.

The agency will issue up to $70 million in lease-revenue bonds to raise money to build the improvements and lease the improved stadium back to the city under the facility lease for approximately $7 million a year. The city will make semiannual rental payments from its general fund; base rental payments will equal debt service on the bonds and additional rental payments will equal expenses of bond administration. The city will take necessary action to include base rental in the budget for each year, subject to section 5.06(b)[3] of the facility lease which provides: "THE OBLIGATION OF THE CITY TO MAKE BASE RENTAL PAYMENTS DOES NOT CONSTITUTE AN OBLIGATION OF THE CITY FOR WHICH THE CITY IS OBLIGATED TO LEVY OR PLEDGE ANY FORM OF TAXATION OR FOR WHICH THE CITY HAS LEVIED OR PLEDGED ANY FORM OF TAXATION. NEITHER THE BONDS NOR THE OBLIGATION TO MAKE RENTAL PAYMENTS CONSTITUTES AN INDEBTEDNESS OF THE CITY, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY DEBT LIMITATION OR RESTRICTION." (Capitalization in original.) The agency will repay bond investors from earnings on funds generated by the bonds and base rent paid by the city under the facility lease.

If the city defaults on rent due under the facility lease,[4] the agency or its assignee (assignee includes trustee of the bonds) may elect to affirm[5] the facility lease and (1) continue to collect rent from the city without taking possession or (2) take possession, relet the stadium and collect the

---

[3]As used throughout, the word "section" followed by a number refers to provisions in the facility lease.

[4]Under section 5.04 of the facility lease, rent is abated when damage or destruction substantially interferes with the city's use and possession of any portion of the stadium. "Any abatement of rental payments pursuant to Section 5.04 . . . shall not be considered an event of default . . . ." (§ 5.04(2).)

[5]Upon default, the agency or its assignee may also elect to terminate the lease. (§ 10.01(c)(1).)

rent deficiency from the city. In the event the agency exercises its right to relet the stadium, it does so as the city's "agent and attorney-in-fact" (§ 10.01(c)(2)(B)) and subject to all of the city's obligations with third parties "relating in any way to the [stadium]." (§ 10.01(c)(3).)

Bond investors are advised that if the city defaults, there is no right to accelerate base rental payments. They are also informed: "If the City defaults on its obligation to make Base Rental Payments with respect to the [stadium], the [agency] or the Trustee may retain the . . . Facility Lease and hold the City liable for all Base Rental Payments as each becomes due and enforce any other term or provision of the . . . Facility Lease to be kept or performed by the City. There is no remedy of acceleration of the total Base Rental Payments due over the term of the . . . Facility Lease, and the Trustee would be required to seek a separate judgment each year for that year's defaulted Base Rental Payments."

*Validation Action*

In February 1996, the city and agency filed an action in superior court seeking validation of the leases, bonds and related ordinances and resolutions.[6] Richard Rider, Bruce Henderson and Steve Green (collectively Rider) answered. In an effort to resolve the issue on an expedited basis, the court shortened time for hearing a motion for summary judgment.

On April 2, the court granted summary judgment for the city and agency. Among other things, the court found the facility lease, ground lease and bonds were valid, constitutional and binding obligations enforceable under the terms of the agreements. The court explained:

"As to the validity of the lease, the plaintiffs have established that the lease falls within the well-established contingent-payment exception to the constitutional limitation on indebtedness of a city. (California Constitution Article XVI, section 18.) The lease specifically says the City of San Diego has no obligation to levy or pledge any form of taxation to pay rent or support the bonds. (Lease, section 5.06.) The [agency] has no right to

---

[6]Code of Civil Procedure section 860 et seq. authorizes a public agency to file suit to validate its actions. Code of Civil Procedure section 870, subdivision (a) provides: "(a) The judgment, if no appeal is taken, or if taken and the judgment is affirmed, shall, notwithstanding any other provision of law including, without limitation, Sections 473 and 473.5, thereupon become and thereafter be forever binding and conclusive, as to all matters therein adjudicated or which at that time could have been adjudicated, against the agency and against all other persons, and the judgment shall permanently enjoin the institution by any person of any action or proceeding raising any issue as to which the judgment is binding and conclusive." (Code Civ. Proc., § 870, subd. (a).)

accelerate rent on default, and the remedies for default are limited. Defendants' allegations to the contrary are completely speculative and lacking in foundation. Furthermore, defendants' arguments that the [agency] is somehow defective as a 'mere shell' ignores the long line of cases approving the establishment of such public entities.

"[T]he Court [also] finds the [agency] is not constrained in the issuance of bonds by the provisions of the City's Charter. (City Charter Article VII, section 90.) The [agency] is a Joint Exercise of Powers Agency created by the City of San Diego and the Redevelopment Agency of the City of San Diego. The authority of the [agency] derives from the agreement establishing it as a public entity and the legislative scheme which authorizes and empowers such entities. There is a long line of authority upholding the validity of such entities. No case law has been cited which would constrain the [agency] to the limits of the City's Charter. Once created, the [agency] is an independent public agency governed by the State laws pursuant to which it was created. (Government Code sections 6507, 6508.) It is specifically empowered to issue bonds under Government Code section 6588."

Rider appealed. He has tailored the scope of his appellate challenge[7] and, with certain exceptions, focuses on the facility lease. Thus, we begin our discussion with the facility lease.

### DISCUSSION

#### I.

The California Constitution requires a two-thirds vote of the electorate before a municipality may incur an obligation in excess of its yearly revenue. Article XVI, section 18, provides in part: "No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose . . . ." Enacted in response to concern over excessive municipal indebtedness, the provision provided an instrument to control local borrowing and established the "pay-as-you-go" principle in municipal finance. (Grodin et al., The Cal. State Constitution: A Reference Guide (1993) p. 298; see *Starr* v. *City and County of San Francisco* (1977) 72 Cal.App.3d 164, 173-174 [140 Cal.Rptr. 73].)

---

[7]At oral argument, Rider confirmed he has abandoned arguments previously raised relating to the city charter, the statutory basis for the agency to issue bonds and alter ego issues. From the briefs, it also appears he has abandoned arguments involving the constitutional power of the Legislature to grant joint powers agencies independent bonding authority, securities law violations and the need for additional discovery.

■ In a generalized attack on the financing here, Rider asserts the facility lease is intended to avoid a two-thirds vote and is therefore invalid. We disagree. Even if the facility lease were written to permit the city to finance the stadium improvements without a vote of the electorate, the intent to avoid a vote does not render the facility lease constitutionally invalid. The validity of the facility lease does not depend on the city's intent.[8] Rather, it depends fundamentally on whether the city's contractual obligations create prohibited debt.

In an uninterrupted line of decisions approving government commitments of every kind—from agreements to haul sewage to leases of offices and courthouses—our high court has sanctioned contracts in which public entities have entered into long-term obligations without obtaining voter approval. As the Supreme Court has consistently stated, the question is whether the public entity's debt incurred in a particular year is a debt that can be paid from that year's income. If the answer is yes, the public entity has not incurred constitutionally prohibited indebtedness under article XVI, section 18, and, thus, no public vote is required. In other words, if no indebtedness comes about until consideration is furnished, there is no violation of the "pay-as-you-go" rule. By contrast, where contractual obligations create immediate debt for an aggregate amount, the constitutional restriction applies.

In *McBean* v. *City of Fresno* (1896) 112 Cal. 159 [44 P. 358], the Supreme Court upheld a five-year contract to haul sewage over the objection it had not been submitted to the voters. In line with a series of earlier decisions construing the constitutional limitation on indebtedness to mean "[e]ach year's income and revenue must pay each year's indebtedness and liability" (*id.* at p. 164), the court concluded each year's installment was within the public entity's income as evidenced by the fact each year's payment was for consideration furnished that year. As the court stated, "[I]t is at once seen that the city cannot be liable in any one year for more than [the amount of one year's services], an amount far within the revenue derived to the sewer fund; and, further, that it cannot become liable for this amount at all until faithful service rendered by the contractor each year." (*Id.* at p. 167.)

In *City of Los Angeles* v. *Offner, supra,* 19 Cal.2d 483, the City of Los Angeles proposed to lease real property for 10 years for $1 a month to a bidder who would construct an incinerator and lease the incinerator and property back to the City of Los Angeles for a monthly rental. Title to the incinerator would remain in the bidder unless the City of Los Angeles exercised its option to purchase. The Supreme Court determined the lease

---

[8]We return to this issue in part III, *post.*

did not create a prohibited debt for purposes of the constitutional provision because no indebtedness came into existence until the consideration was actually furnished. In support of this conclusion, the court observed the monthly rent was intended to reflect fair rental value for each month's use, purchase of the incinerator was tied to its appraised value and the City of Los Angeles was not obligated to exercise its option to purchase. (*Id.* at p. 487.)

In *Dean* v. *Kuchel, supra,* 35 Cal.2d 444, the state proposed a lease arrangement under which the state leased real property for a 35-year term to a contractor who would build an office building and then lease the building back to the state for 25 years. Title to the building would vest in the state at the end of 25 years if it performed all its duties under the lease, and in any event, at the end of the 35-year lease.

The Supreme Court held the contract qualified as a lease and did not violate the constitutional debt limitation. (*Dean* v. *Kuchel, supra,* 35 Cal.2d at p. 448.) The high court noted the rental payments were for month-to-month use and declared there was no logical distinction between the option to purchase in *Offner* and vesting of title in the state at the end of the lease term in *Dean.*[9] *(Ibid.)* The court summarized as follows: " '[*I*]*f the lease or other agreement is entered into in good faith and creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year, no violence is done to the constitutional provision.*' [Citations.] If, however, the instrument creates a full and complete liability upon its execution, or if its designation as a "lease" is a subterfuge and it is actually a conditional sales contract in which the "rentals" are installment payments on the purchase price for the aggregate of which an immediate and present indebtedness or liability exceeding the constitutional limitation arises against the public entity, the contract is void. [Citations.]' " *(Id.* at pp. 446-447, quoting *City of Los Angeles* v. *Offner, supra,* 19 Cal.2d at pp. 485-486, italics added.)

In *County of Los Angeles* v. *Byram* (1951) 36 Cal.2d 694 [227 P.2d 4], the Supreme Court upheld a lease-back arrangement in which a county retirement board built a courthouse and leased it back to the county. The lease required the county to pay monthly rent calculated to reimburse the board for its investment plus interest. The court held the duty to build a courthouse

---

[9]As the court described it, "True, [in *Offner*] the city was not bound to execute the option and thus pay the purchase price, but it was required to pay the rentals. Here the rentals also must be paid but the state need not pay any more." *(Dean* v. *Kuchel, supra,* 35 Cal.2d at p. 448.)

was one imposed by law and not one voluntarily incurred and was thus beyond the ambit of the constitutional debt limitation. The court also concluded there was no rational distinction between the financing and that in *Offner-Dean* and determined the transaction was a valid lease—i.e., no indebtedness came into existence until consideration was actually furnished. (*Id.* at pp. 698-700.)

In short, the Supreme Court lease cases rest on the principle that leases do not create present debt for aggregate payments due; rather, the debt is restricted to each payment as it falls due. This principle has been refined in the lease-financing cases after *Offner-Dean* to include the corollaries that payment of future rent may not be accelerated and rent is abated when the tenant is deprived of use by the default of the landlord. (*County of Los Angeles* v. *Nesvig* (*Nesvig*) (1965) 231 Cal.App.2d 603, 611 [41 Cal.Rptr. 918]; *Starr* v. *City and County of San Francisco, supra,* 72 Cal.App.3d at p. 172.)

The facility lease here mirrors the contracts approved in these cases in substantial respects:

the city pays rent semiannually as consideration for the right of use, possession and quiet enjoyment of the improved stadium (§ 5.01(c));

liability for rent is confined to each installment as it falls due (§§ 5.01(c)(1) & 10.01(c)(2)(A));

there is no dispute that the city treasury will always contain unencumbered revenue sufficient to satisfy the semiannual rental obligations;

the contract is typical of long-term lease-back financing commonly used to fund public construction; and

most important, if the city defaults on the rent, the lease creates no immediate indebtedness for aggregate payments due because the agency has waived its Civil Code section 1951.2 rights to future rent on an accelerated basis (§ 10.01(e)).

These provisions comply with *Offner-Dean*: there is no immediate indebtedness for aggregate installments; liability is confined to rental payments as they fall due; and each rental payment is for consideration furnished that year. Accordingly, we determine the general structure of the facility lease does not create article XVI, section 18, prohibited debt.

## II.

We turn to specific provisions in the facility lease and examine whether any of these lease provisions take the facility lease beyond constitutionally acceptable limits.

### A.

We start with the default provisions and concentrate on three subprovisions: sections 10.01(c)(2)(A), which permits reletting; 10.01(c)(2)(D), which awards to the agency excess rent received on reletting; and 10.01(c)(2)(E), which may require payment for alterations upon reletting. In evaluating these provisions, we address the consequences of a default as bargained for by the parties. The fundamental concept remains—the constitution by its terms requires only that current debt not exceed current revenue. ▆▆▆ The constitutional debt limitation is to prevent deficit financing, i.e., incurring debt in one year to be paid in future years, only to find it has increased "like a rolling snowball," placing the public entity in a position where it might not be able to meet financial obligations in the future. (*McBean* v. *City of Fresno, supra,* 112 Cal. at p. 164.)

### 1.

In the event of a default caused by the city's failure to make base rental payments (§ 10.01(a)(1)), the agency may stand on the lease, deem the stadium available for use by the city and collect rent from the city as it becomes due. (§ 10.01(c)(2)(A).[10]) The agency also has the option of reletting the stadium without terminating the facility lease and collecting any deficiency in rent from the city on the dates the rent falls due. (§ 10.01(c)(2)(A).)

---

[10]Section 10.01(c)(2)(A) provides in part: "The [agency] or its assignee, in addition to all other rights and remedies it may have at law, shall have the option . . . [w]ithout terminating this Facility Lease, to collect each installment of rent as it becomes due and enforce any other term or provision hereof to be kept or performed by the City, and/or to exercise any and all rights to retake possession of the [stadium].

"(A) In the event the [agency] or its assignee does not elect to terminate this Facility Lease in the manner provided for in Section 10.01(c)(1) hereof, the City shall remain liable and agrees to keep or perform all covenants and conditions herein contained to be kept or performed by the City and, to pay the rent to the end of the term of this Facility Lease or, in the event that the [stadium] is re-let, to pay any deficiency in rent that results therefrom; and further agrees to pay said rent and/or rent deficiency punctually at the same time and in the same manner as hereinabove provided for the payment of rent hereunder (without acceleration), notwithstanding the fact that the [agency] or its assignee may have received in previous years or may receive thereafter in subsequent years rental in excess of the rental herein specified and notwithstanding any retaking of possession of the [stadium] by the [agency] or its assignee or suit in unlawful detainer, or otherwise, brought by the [agency] or its assignee for the purpose of obtaining possession of the [stadium]."

Rider argues this reletting provision violates *Offner-Dean* because the city does not obtain any benefit when it is not in possession of the property. He maintains that because the reletting provision requires payment irrespective of revenue or use, it constitutes an unconstitutional debt.[11] The city and agency counter the reletting provision is a security device similar to the type approved in *Nesvig, supra,* 231 Cal.App.2d 603, and other cases.[12]

In *Nesvig,* the county proposed to lease real property to a bidder to build a theater and music center. The successful bidder would lease the improved property back to the county for 30 years. In the event the county defaulted in its rent payments, the bidder could reenter and terminate the lease, or reenter without terminating the lease and relet the premises for the county's account.

The court rejected the argument that the lease violated article XVI, section 18, because the county was precluded from terminating its obligations and "walking away from the lease:" "The gist of this argument seems to be that because the bidder can reenter and operate for the account of the county, the county is more firmly bound than if the bidder merely sued for rent at the end of each accrual period. We do not agree with this reasoning, for in the absence of any provision which would accelerate payment of the debt on default the obligation of the county remains precisely the same, *viz.,* to pay certain fixed annual rentals, whether the bidder reenters or not." (*Nesvig, supra,* 231 Cal.App.2d at p. 611.)

*Nesvig* construed the reletting provision as a security device not unlike that in *Dean* and "merely declaratory" of California landlord-tenant law. (*Nesvig, supra,* 231 Cal.App.2d at pp. 611-612.) *Nesvig* further reasoned that reletting did not offend the constitutional debt limitation because the county continued to receive consideration whether or not the property was relet; the first tenant received consideration in the form of a rent reduction—"value of

---

[11]Rider reads the reletting provision in conjunction with section 5.06(a) which provides: "The agreements and covenants on the part of the City contained herein shall be deemed to be and shall be construed to be duties imposed by law and it shall be the duty of each and every public official of the City to take such action and do such things as are required by law in the performance of the official duty of such officials to enable the City to carry out and perform the agreements and covenants contained herein agreed to be carried out and performed by the City."

[12]Although the city and agency urge us to take judicial notice of the leases in *Nesvig, supra,* 231 Cal.App.2d 603, *Ruane* v. *City of San Diego* (1968) 267 Cal.App.2d 548 [73 Cal.Rptr. 316] and other cases based on the representation that the leases contain default provisions that are virtually identical to the one in our case, we decline to do so. Cases are not authority for propositions not considered or adjudicated. (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524 [39 Cal.Rptr. 377, 393 P.2d 689]; *Estate of Hafner* (1986) 184 Cal.App.3d 1371, 1385 [229 Cal.Rptr. 676].) We will not look behind the record for particular lease provisions, which may or may not have been brought to the attention of the court and may or may not have led to its conclusions.

the use of the property from year to year in the form of credits against its obligation." (*Nesvig, supra,* 231 Cal.App.3d at p. 612.)

In our view, *Nesvig* was properly decided and is consistent with the rationale upon which *Offner-Dean* is premised. Where reletting permits the initial tenant to continue to receive consideration, i.e., some present economic value from the lease, the constitution is not offended, even if the tenant is precluded from possession and still must make some form of payment.

Our task, therefore, is to determine whether under the facility lease the city continues to receive consideration even if the property is relet after the city defaults. As explained below, we conclude it does. These benefits continue in the form of a rent credit and the guarantee that the city's existing contractual obligations relating to the use of the stadium will be performed.

The default and reletting provisions here are much like those examined in *Nesvig*. If the agency affirms the lease, the city must "pay the rent to the end of the term of this Facility Lease" absent any relet. (§ 10.01(c)(2)(A).) The agency may "collect each installment of rent [but only] as it becomes due"—i.e., it may not accelerate the payments. (§ 10.01(c)(2)(A).) If the agency retakes possession and relets the stadium, the city receives a credit and is obligated only on the rental deficiency, which results as each payment falls due (§ 10.01(c)(2)(A)).

While the city is required to pay if the rent collected is less than the city's rental obligation, the city is entitled to a credit for the amount paid by the sublessee. As in *Nesvig*, the city then receives "value of the use of the property from year to year in the form of credits against its obligation." (*Nesvig, supra,* 231 Cal.App.3d at p. 612.) Under these circumstances, the city's rent reduction after a default is a form of consideration required by *Offner-Dean.*

Furthermore, in the event of a reletting, the facility lease requires the agency to act as "the agent and attorney-in-fact" of the city.[13] While we recognize that in many instances an "agency to relet" clause may merely be

---

[13]Section 10.01(c)(2)(B) provides: "Should the [agency] or its assignee elect to retake possession of the Leased Property as herein provided, the City hereby irrevocably appoints the [agency] or its assignee as the agent and attorney-in-fact of the City to re-let the Leased Property, or any items thereof, from time to time, either in the [agency's] or its assignee's name or otherwise, upon such terms and conditions and for such use and period as the [agency] or its assignee may deem advisable and the City hereby indemnifies and agrees to save harmless the [agency] or its assignee from any costs, loss or damage whatsoever arising out of, in connection with, or incident to any retaking of possession of and re-letting of the

a "fiction" (see conc. & dis. opn., p. 1502, fn. 5), here this provision has real and significant meaning. The agency and/or the sublessee are bound to honor, *and must perform*, the city's obligations with its tenants and other contracting parties, including the Chargers and the Padres.[14] Thus, the agency is contractually required to relet the stadium for the benefit of the city and its existing contracts. Should the agency or the sublessee fail to satisfy these obligations, the city would have standing to enforce such obligations.

Reading the lease provisions together, we believe the city obtains benefits from the facility lease even if it is not in actual possession. The city obtains substantial benefit since its existing contracts and licenses with stadium tenants must be performed and satisfied. Additionally, the city has a right to a credit on the rent for which it would otherwise be obligated to pay.

In the final analysis, as in *Nesvig*,[15] the obligation of the city to make rent payments as they become due remains precisely the same: the city has an obligation to pay semiannual rent if there is no reletting, and it has the same obligation with a right to a credit on the rent if the agency relets. Under these circumstances, we conclude the provision allowing the agency to relet the stadium will not convert the city's obligation to pay rent into a prohibited debt under article XVI, section 18, when it was not previously a prohibited debt. Because the city continues to receive consideration, *Offner-Dean* principles are not violated.

---

Leased Property by the [agency] or its assignee or its duly authorized agents in accordance with the provisions herein contained."

[14]Section 10.01(c)(3) provides: "Notwithstanding anything herein to the contrary, the [agency] shall not reenter or re-let the [stadium] upon the occurrence of an Event of Default, unless the [agency] or its sublessee agrees to perform all of the City's obligations under the Chargers Agreements, the Padres Agreement, the SDSU Agreement, the Association Agreement, the Service America Agreements and any other then existing lease, license or other agreement relating in any way to the [stadium]. In addition, the [agency] shall not reenter or re-let the [stadium] upon the occurrence of an Event of Default, unless the [agency] or its sublessee agrees to continue to honor the rights of the Chargers under the Chargers Agreements, the Padres under the Padres Agreement, the SDSU under the SDSU Agreement, the Association under the Association Agreement, Service America under the Service America Agreements and any other parties under any other leases, licenses or other agreements in any way involving the [stadium] . . . ."

[15]We recognize *Nesvig* is a 1965 case, and the law governing a landlord's remedies after a tenant breach was changed in 1970. (See Civ. Code, § 1951.2; see also 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 665, p. 849.) The prior statutes required a landlord who relet the premise to sue the tenant for the deficiency at the end of the full lease term. The current statutes permit a landlord to immediately recover future rent reduced to present worth for the balance of the lease term. (Civ. Code, § 1951.2.)

This change in the law, however, is not significant to our analysis. Read in context, *Nesvig*'s conclusion as to the validity of the lease was not necessarily dependent on the terms of the pre-1970 law. Likewise, many of the so-called new remedies generally existed before 1970 so long as the leases so provided. (4 Witkin, *op. cit. supra*, § 673 at pp. 857-860.)

2.

Having determined the reletting provision does not offend article XVI, section 18, we turn to section 10.01(c)(2)(D), a default provision in which the city waives the right to any excess rent collected upon reletting.[16] Our approach is straightforward. Once the city's rental obligation is reduced to zero, there is no debt, and if there is no debt, article XVI, section 18, is not implicated. Consequently, from a constitutional standpoint, the fact that the city has agreed to waive excess rents is irrelevant.

Our concurring and dissenting colleague contends section 10.01(c)(2)(D) renders the reletting provision (§ 10.01(c)(2)(A)) invalid. Our colleague argues that the facility lease may be construed as constitutional only if the lease terms mirror the common law rule that, after reletting, the public entity tenant is permitted to obtain all the economic value of the lease, including the opportunity to receive excess rent. In short, our colleague claims that when the city agreed to waive excess rents, it undermined the rationale upon which the validity of the reletting clause is based.

This narrow view is not supported by Supreme Court precedent and fails to recognize that notwithstanding the waiver of excess rent, the city continues to receive consideration. Our colleague's approach disregards the existence and significance of the agency's obligation, upon reletting, to honor and perform the city's existing contracts with third parties (§ 10.01(c)(3));[17] it also ignores credit against rent. Our colleague's position further overlooks that sections 10.01(c)(2)(A) and 10.01(c)(2)(D) become applicable only upon default by the city. A party in breach of its contractual obligations cannot reasonably expect to continue to receive the full benefit of the bargain. The point is, upon default, the city continues to receive legally sufficient consideration even though the stadium has been relet and the city has waived excess rent. Section 10.01(c)(2)(D) does not transform the financing arrangement at issue here from a legitimate lease into prohibited debt.

The provision waiving excess rents on reletting complies with article XVI, section 18.

---

[16]Section 10.01(c)(2)(D) states: "The City further waives the right to rental payments obtained by the [agency] or its assignee in excess of the rental payments herein specified and hereby conveys and releases such excess to the [agency] or its assignee as compensation to the [agency] or its assignee for its services in re-letting the Leased Property or any items thereof."

[17]For example, without this provision, the city would have no protection from exposure to lawsuits filed by unhappy third party tenants as a result of the reletting.

### 3.

Next, we address section 10.01(c)(2)(E),[18] which permits the agency to recover from the city the cost of alterations or repairs necessary to place the stadium in a condition for reletting. Unlike sections 10.01(c)(2)(A) and 10.01(c)(2)(D), discussed above, the parties agree that the validity of this provision is fact specific. Some factual scenarios may create prohibited debt, others will not. In other words, the validity of the provision depends on the extent, cost and timing of the alteration or repair.[19]

Under basic rules of statutory and contract construction, provisions subject to both lawful and unlawful interpretations are to be interpreted in a manner which makes them lawful. Because the facility lease is part of the ordinance adopted by the city council in connection with the stadium expansion, those principles apply here.

If a statute is susceptible of two constructions, one that will render it constitutional and one that will either render it unconstitutional or else raise serious constitutional concerns, the court will adopt a constitutional construction. (*People* v. *Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 509 [53 Cal.Rptr.2d 789, 917 P.2d 628].) The rules of statutory construction apply with equal force to ordinances. (*Rodriguez* v. *Solis* (1991) 1 Cal.App.4th 495, 502 [2 Cal.Rptr.2d 50]; *Aptos Seascape Corp.* v. *County of Santa Cruz* (1982) 138 Cal.App.3d 484, 497 [188 Cal.Rptr. 191].)

As a contract, the lease "must receive such an interpretation as will make it lawful . . . if it can be done without violating the intention of the parties." (Civ. Code, § 1643.) Here the facility lease itself provides the city and agency intended the lease be carried out in a lawful and constitutional fashion. (§ 5.06(b).)

There are any number of circumstances in which the alteration and repair provision can be implemented in a manner constitutionally consistent

---

[18]Section 10.01(c)(2)(E) provides: "The City further agrees to pay the [agency] or its assignee the cost of any alterations or repairs to the [stadium] or any items thereof necessary to place the [stadium] or any items thereof in condition for re-letting immediately upon notice to the City of the completion and installation of such alterations or repairs."

[19]No California case has evaluated a provision like the alteration and repair provision before us. In *Ruge* v. *State* (1978) 201 Neb. 391 [267 N.W.2d 748], the Nebraska Supreme Court concluded a lease provision requiring the state to pay the reasonable costs of reletting and alteration incurred by the landlord violated the state constitutional debt limitation. In the court's words, the provision was an "open-ended promise" to pay which "[became] effective upon a termination of the lease and qualifie[d] the earlier provisions which conditioned the liability of the state upon a legislative appropriation having been made at the commencement of each rental period." (*Id.* at p. 752.) The Nebraska Supreme Court declared the clause "invalid and unenforceable" but sustained the validity of the financing arrangement.

with debt limitation limits and *Offner-Dean*. For example, if the agency makes the alterations and repairs necessary for reletting and charges the city for the work the same fiscal year, the constitution is satisfied because the city's payment is for a debt incurred in the same fiscal year it is due. By contrast, if the remedy upon default results in future debt, it would render the provision constitutionally invalid. In that event, the city would have no obligation to perform, and the agency could not compel performance. (§ 5.06(b).) Accordingly, because the provision is reasonably susceptible of a construction that is constitutionally valid, it is entitled to such construction in this validation proceeding.

### B.

Rider tenders a number of other contract arguments, all of which we find unpersuasive. We treat them briefly below.

### 1.

Rider argues the provision in the facility lease, which (1) requires the city to purchase insurance to cover 24 months of base rental payments to the agency in the event an earthquake or other hazard renders the stadium unavailable for use and (2) permits the agency to buy the insurance if the city fails to maintain it, exceeds the *Offner-Dean* limits. (§§ 6.03(a) & 6.04.[20]) Rider contends (1) if the city does not buy the insurance, (2) the agency fails to obtain it and (3) there is a catastrophic earthquake, nothing in the lease bars the agency from suing the city for damages of 24 months of rent even though loss of use due to earthquake damage would normally abate the city's duty to pay rent.

The thrust of the argument is *not* that article XVI, section 18, makes it improper for the city to procure the insurance or pay the premiums from year to year, but rather that article XVI, section 18, is violated when the city fails

---

[20]Section 6.03(a) provides in pertinent part: "The City shall procure . . . and maintain . . . throughout the term hereof . . . . : [¶] (1) Insurance against loss or damage to the [stadium] caused by fire, lightning or earthquake . . . [and] [¶] (2) Use and occupancy insurance against loss, total or partial, of the use and occupancy of the [stadium] as a result of any of the hazards covered by the insurance required by [subpart (a)(1)] hereof, in an amount sufficient to pay the Base Rental Payments attributable to the [stadium] for a twenty-four month period . . . ."

Section 6.04 provides in pertinent part: "In the event the City shall fail to maintain the full insurance coverage required hereby . . . the agency may (but shall be under no obligation to) purchase the required policies of insurance and pay the premiums on the same . . . ."

to buy the insurance.[21] We view the argument as unsound and premature. This is a validation action, and our concern is with what is in the facility lease—not with what is missing. We see no reason to speculate on what might happen if the city breaches its duty to provide loss-of-use insurance, there is an earthquake and the agency files an action.

### 2.

 Rider complains the facility lease is not supported by consideration because it obligates the city to pay rent for use of a stadium it already owns. To the contrary, the city is paying rent for use of an improved stadium, not for use of the one it presently owns.

### 3.

Rider asserts it is improper under *Starr* v. *City and County of San Francisco, supra,* 72 Cal.App.3d 164, to spend part of the bond proceeds on off-site improvements to build a training facility and offices for the San Diego Chargers. Rider attempts to take *Starr* too far.

In *Starr,* the court determined a municipal lease-back arrangement was valid because each rental payment would be supported by consideration furnished that year, i.e., occupancy and use of the project. (*Starr* v. *City and County of San Francisco, supra,* 72 Cal.App.3d at p. 172.) A separate Department of Housing and Urban Development repayment contract, however, was held not to satisfy the *Offner-Dean* rule because it created a "future charge against general funds," which was not supported by consideration in the year the obligation was incurred and which could not be included in the yearly budget. (*Id.* at p. 176.) Contrary to Rider's contention, nothing in the opinion suggests a restriction on how or for what purpose a public entity may use bond proceeds obtained in the financing arrangement.

### 4.

Rider argues the ground lease is void for lack of consideration and uncertainty. He also argues the facility lease rent does not reflect fair rental

---

[21]While he does not pursue the argument, Rider adds in passing that, even if the city fulfills its duty and buys the insurance, *Offner-Dean* may be violated because the premium represents payment for use when the stadium is unavailable. Assuming the argument were squarely before us, we would nevertheless be compelled to reject it. The city is paying a yearly premium to buy insurance, which the agency as landlord requires for use of the property. In the event of an occurrence under the policy, i.e., an earthquake, the carrier will pay the proceeds. The fact that the proceeds the carrier pays is equal to 24 months of rent does not convert the annual premium the city pays into 24 months of rent; the city is not obligated to pay rent for the period the city's use of the stadium is substantially impaired by damage or destruction.

value and, since the determination of value is a factual matter, the issue should be remanded to the trial court for resolution. These arguments were either conceded or not raised below.

■ A party waives a new theory on appeal when he fails to include the underlying facts in his separate statement of facts in opposing summary judgment. (*North Coast Business Park* v. *Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 30-32 [21 Cal.Rptr.2d 104].) A new theory on appeal is also waived when the new theory involves a controverted factual situation not put in issue below. (*Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184].) In his separate statement filed in opposition to respondents' summary judgment motion, Rider conceded that consideration for the ground lease included the agency's agreement to construct the improvements required by the 1995 agreement. In opposing the motion, he never contended the ground lease was uncertain or raised the factual issue of fair rental value in either his argument or separate statement. The superior court was the proper forum in which to raise these issues. We deem the arguments waived.

## III.

Finally, stepping back from contract-based issues, we return to a theme echoed throughout Rider's argument: the city purposely structured the transaction to avoid the need for a two-thirds vote and thus violated the rule of *Rider* v. *County of San Diego, supra,* 1 Cal.4th 1 (*County*).[22]

In *County*, the San Diego County Regional Justice Facility Financing Agency (FFA) imposed a half-cent sales tax to finance construction of jail and courthouse facilities. The issue was whether the post-Proposition 13 FFA could validly levy the tax with the approval of only a simple majority of the electorate rather than a two-thirds vote, which is required under California Constitution, article XIII A, section 4 (hereafter article XIII A, section 4), before any special district can impose a special tax.[23] The California Supreme Court held the tax invalid explaining (1) the FFA was a "special district," and (2) the tax was a "special tax." (*County, supra,* 1 Cal.4th at pp. 10-15.)

---

[22]We refer to *Rider* v. *County of San Diego* as *County* to avoid any confusion between the opinion and the name we have been using collectively to refer to appellants.

[23]Proposition 13 established a one percent limit on ad valorem taxes on real property (Cal. Const., art. XIII A, § 1) and at the same time prohibited the imposition of special non-real-property taxes that would undermine the one percent limit unless adopted by a two-thirds vote (art. XIII A, § 4). Article XIII A, section 4, provides: "Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

Rider argues the applicability of *County* by analogy. In doing so, he quotes extensively from the opinion, consistently replacing references to the tax limitation under article XIII A, section 4, with citations to the debt limitation under article XVI, section 18. Then, without analyzing whether interchanging these two provisions is conceptually sound, Rider concludes that the "lesson" to be learned from *County* is that a public body such as the city may not intentionally circumvent the constitutional requirement of a two-thirds vote by creating a new entity such as the agency. While there is much to be learned from *County*, we find it inapplicable to *Offner-Dean* issues.

First, *County* is limited in scope to the taxing power under article XIII A, section 4: it deals exclusively with the issue of whether the public entity is a "special district" and whether the tax is a "special tax." The opinion says nothing about the spending power under article XVI, section 18, nothing about lease financing and nothing about *Offner-Dean*. Except for a reference in *County* to *Vanoni v. County of Sonoma* (1974) 40 Cal.App.3d 743 [115 Cal.Rptr. 485], there is no suggestion the constitutional debt limitation has any application to the issues in that case.

In *Vanoni*, the water district entered into a contract to pay the federal government $40 million over 50 years to build a dam. Taxpayers challenged the contract as violative of the predecessor to article XVI, section 18 (former Cal. Const., art. XIII, § 40). Conceding the constitutional provision did not apply to a water district, the taxpayers argued the district and county were one and the same and that because the county was subject to the constitutional debt limitation, the water district was also. (*Vanoni v. County of Sonoma, supra*, 40 Cal.App.3d at p. 749.) Rejecting the argument even though the district and county shared the same boundaries, governing boards, citizens and taxable property and the district performed traditional county functions, the court concluded the district was a separate legal entity not subject to the debt limitation because there had been no showing " 'the entity subject to the limitation [i.e., the county] *controlled the decision to incur the debt or levy the tax.*' " (*Vanoni v. County of Sonoma, supra*, 40 Cal.App.3d at p. 750; accord, *County, supra*, 1 Cal.4th at p. 12.)

*Vanoni* does not change our analysis. Here it is the city, not the agency, which makes the payments under the facility lease and we have concluded these payments do not require voter approval under the *Offner-Dean* rule. Rider's argument that the city controls the agency is thus irrelevant because

there is no subterfuge—no switching of entities to avoid a vote.[24] This case is consistent with the rationale in *Vanoni*.

Second, to the extent Rider attempts to use the "lesson" of *County* to attack the financing arrangement on the basis that it was designed to avoid a vote, he faces an overwhelming obstacle. The *Offner-Dean* rule recognizes the facility lease is *not* a subterfuge for a conditional sales contract; the lease does not create an immediate indebtedness for aggregate payments and it does not violate the constitutional debt limitation. As discussed above, the *Offner-Dean* rule applies even where the public entity may have intended to avoid a vote. (*City of Los Angeles* v. *Offner, supra,* 19 Cal.2d at p. 486; *Dean* v. *Kuchel, supra,* 35 Cal.2d at p. 447.)

Third, to the extent Rider is attempting to argue *County* prevents the city from contracting with the agency, he faces the additional hurdle of precedent approving the mechanism of the facility lease notwithstanding an intimate relationship between the contracting parties. Rejecting a similar argument, the Supreme Court upheld a lease between the county and its retirement board in *County of Los Angeles* v. *Byram, supra,* 36 Cal.2d 694.[25] Rider's theory of "purposeful circumvention" simply has no application to this case. As *Lagiss* v. *County of Contra Costa, supra,* 223 Cal.App.2d 77, summarizes: "Entering into such a lease-option agreement has the legislative sanction both as to [counties] and their retirement systems. These provisions, when read with the Supreme Court decisions . . . , clearly indicate that such a lease-option agreement is not a subterfuge, but, to the contrary, a legitimate financial transaction, not repugnant to the constitutional provision in question and one into which both the County and the Board of Retirement may enter intentionally and in order to arrive at a predetermined result in conformity with the spirit and purpose of the law." (*Id.* at p. 94.)

We are not in a position to overrule the Supreme Court. We further remain unconvinced the "teaching" of *County* can or should be lifted out of the context of the taxing limitation under article XIII A, section 4, and superimposed into the body of law involving the debt limitation under article

---

[24]Repeated provisions in the bond issuing documents inform the bondholders that any cause of action they (or more properly their trustee) may have arises out of the assignment to the trustee of the agency's interest in the facility lease.

[25]The appellate courts have followed suit in cases involving leases between counties and their retirement boards. (*McClain* v. *County of Alameda* (1962) 209 Cal.App.2d 73 [25 Cal.Rptr. 660], and *Lagiss* v. *County of Contra Costa* (1963) 223 Cal.App.2d 77 [35 Cal.Rptr. 450].) In *Corona etc. Hosp. Dist.* v. *Superior Court* (1964) 61 Cal.2d 846 [40 Cal.Rptr. 745, 395 P.2d 817], *Ruane* v. *City of San Diego, supra,* 267 Cal.App.2d 548, and *City of La Habra* v. *Pellerin* (1963) 216 Cal.App.2d 99 [30 Cal.Rptr. 752], the courts approved leases between public entities and nonprofit corporations which were established for the purpose of facilitating the transaction.

XVI, section 18. Furthermore, we are not persuaded that *County* signals the advent of a new approach to the principles of lease financing.

DISPOSITION

The judgment is affirmed. Parties to bear their own costs on appeal.

McDonald, J., concurred.

**BENKE, Acting P. J.,** Concurring and Dissenting.—While this case presents a number of important and challenging legal issues, I am afraid in the end the majority opinion has not resolved them successfully. I write separately and at some length because in my opinion, the conclusions the majority reaches about the city's financing arrangements undermine the continuing viability of the well-established *Offner-Dean* doctrine. In particular, in its treatment of the arcane area of reletting by a landlord, the majority has developed theories which would permit municipalities to incur debt solely for the purpose of having the debt collected. Needless to say, I do not believe this theory is consistent with the Constitution or existing Supreme Court authority.

Because of these concerns, and for the reasons set forth more fully below, I cannot join in the majority opinion.

A. *Principles*

I begin my analysis by setting forth those areas where I believe there should be no doubt or confusion. A municipal government may, without incurring a debt proscribed by article XVI, section 18 of our Constitution, enter into long-term contracts which in the future will require payment of substantial sums of money for services, products or other consideration to be provided in the future. (*County of Los Angeles* v. *Byram* (1951) 36 Cal.2d 694, 698-700 [227 P.2d 4] (*Byram*); *Ruane* v. *City of San Diego* (1968) 267 Cal.App.2d 548, 554-555 [73 Cal.Rptr. 316] (*Ruane*); see also *McBean* v. *City of Fresno* (1896) 112 Cal. 159, 167 [44 P. 358] (*McBean*); *City of Los Angeles* v. *Offner* (1942) 19 Cal.2d 483, 485-486 [122 P.2d 14, 145 A.L.R. 1358] (*Offner*); *Dean* v. *Kuchel* (1950) 35 Cal.2d 444, 446-447 [218 P.2d 521] (*Dean*); *Starr* v. *City and County of San Francisco* (1977) 72 Cal.App.3d 164, 172 [140 Cal.Rptr. 73] (*Starr*); *Mayhew Tech Center, Phase II* v. *County of Sacramento* (1992) 4 Cal.App.4th 497, 508 [5 Cal.Rptr.2d 702] (*Mayhew*).) Significantly, upon failure by a municipality or the state to pay for what is delivered in the future—whether it is water, cement, a fleet of police cars, access to a communications system or, as here, the right to

possess and occupy a parcel of real property—a judgment against the municipality for the contract price of the consideration delivered may be obtained by the disappointed provider. (*McBean, supra,* 112 Cal. at p. 167; *Mayhew, supra,* 4 Cal.App.4th at pp. 514-515 (conc. opn. of Blease, J.).)

In this case it is important to emphasize that upon breach of a long-term lease, a municipality is not in any sense "off the hook." Like any other tenant it may be repeatedly sued for the prescribed rental payments as they come due. (*Byram, supra,* 36 Cal.2d at pp. 698-700; *Lagiss* v. *County of Contra Costa* (1963) 223 Cal.App.2d 77, 90-91 [35 Cal.Rptr. 450] (*Lagiss*).) However, and this is a critical "however," at common law the right to collect each rental payment depended upon continuation of the tenant's right to possession. (4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 672, pp. 855-856.) Thus, the common law held that any interruption of a defaulting tenant's right to possession terminated the lease *and* the landlord's right to obtain future rent from the tenant. (4 Witkin, Summary of Cal. Law, *supra,* Real Property, § 672, p. 857; *Dorcich* v. *Time Oil Co.* (1951) 103 Cal.App.2d 677, 683 [230 P.2d 10] (*Dorcich*).) This requirement of the common law works very well with the constitutional debt limitation. Because under the common law no liability for rent can arise without the right to possession, *McBean, Offner* and *Dean* involve no sleight of hand or "lawyer's trick" as intimated by some authorities. (See *Constitutionality of Chapter 280, Or. Laws 1975* (1975) 276 Or. 135 [554 P.2d 126, 131].) *McBean, Offner* and *Dean* are on firm ground when they teach us that each rental payment on a long-term lease will be supported by new consideration —the continuing right to possession. (See *McBean, supra,* 112 Cal. at p. 167; *Offner, supra,* 19 Cal.2d at pp. 485-486; *Dean, supra,* 35 Cal.2d at pp. 444, 446-447.[1])

However the cases are equally clear that the ability or willingness of a municipality to pay a future obligation will not provide the consideration

[1]The rationale which supports this rule of law was fully set forth nearly a century ago by the United States Supreme Court in *City of Walla Walla* v. *Walla Walla Water Co.* (1898) 172 U.S. 1, 19 [43 L.Ed. 341, 349, 19 S.Ct. 77] (*City of Walla Walla*). In *City of Walla Walla* the city was bound by a similar debt limitation provision when it entered into a long-term water contract with a private water company. A competing water provider challenged the contract on the ground the long-term nature of the city's obligation created a debt. In rejecting this contention, the court stated: "But we think the weight of authority, as well as of reason, favors the more liberal construction, that a municipal corporation may contract for a supply of water or gas, or a like necessary, and may stipulate for the payment of an annual rental for the gas or water furnished each year, notwithstanding the aggregate of its rentals during the life of the contract may exceed the amount of the indebtedness limited by the charter. There is a distinction between a debt and a contract for a future indebtedness to be incurred, provided the contracting party perform the agreement out of which the debt may arise. There is also a distinction between the latter case and one where an absolute debt is created at once, as by the issue of railway bonds, or for the erection of public improvement, though such debt be payable in the future by installments. In the one case the indebtedness is not created until the

required by the Constitution. " 'Each year's income and revenue must pay each year's indebtedness and liability, and no indebtednes or liability incurred in one year shall be paid out of the income or revenue of any future year.' [Citation.] The constitutional provision is there to insure that 'every separate payment is supported by its own consideration and . . . falls within the budgetary allotment provided for that year. . . .' [Citation.]" (*Starr, supra*, 72 Cal.App.3d at p. 174.)

In short the question which we must ask, and which under *Offner-Dean* must *always* be asked, is for what purpose is a municipal obligation incurred in the first instance? If an obligation is incurred for some consideration to be delivered in the same year the obligation will come due—even if it is delivery of the proverbial peppercorn—the Constitution will be satisfied. However, the Constitution does not permit a municipal debt to be created in one year for the sole reason that the debt itself will be eliminated by payments from municipal coffers in a future year. Were that the case, the city could avoid the trouble of leaseback financing altogether: it could borrow directly as much money as is needed for any improvements and find consideration for its repayment obligations in the dollar-for-dollar reduction of the debt brought about by its own future appropriations or the efforts of third parties.

It is this latter fundamental limitation on borrowing which the majority has not applied with complete vigor.[2]

## B. *Application*

### 1. *Facility Lease Section 10.01(c)(2)(D)*

The primary violation of *Offner-Dean* principles occurs when the majority discusses the landlord's right to keep for its own account all rent generated

---

consideration has been furnished; in the other, the debt is created at once, the time of payment being only postponed." (*Ibid.*)

[2] I do however, agree with the majority's conclusion that nothing in *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1 [2 Cal.Rptr.2d 490, 820 P.2d 1000], or *Vanoni* v. *County of Sonoma* (1974) 40 Cal.App.3d 743, 750 [115 Cal.Rptr. 485], prevents the city from using an intermediary which it controls as part of a lease-back financing arrangement. I note there is no credible claim the city's control over the financing agency makes it directly liable to the bondholders for the principal or interest on the amounts borrowed by the financing agency. (See *City of Palm Springs* v. *Ringwald* (1959) 52 Cal.2d 620, 624-625 [342 P.2d 898]; see also *Lagiss, supra*, 223 Cal.App.2d at p. 94.) Thus, if the city is liable for any debt, it must be debt created by the facility lease. Significantly if the facility lease creates debt, the lease is invalid whether the debt is owed to an entity the city controls or an entity controlled by the bondholders. In either event, the critical question for purposes of applying the debt limitation is not to whom the lease obligations are owed, but whether the obligation is one which creates debt in a future fiscal year.

during a reletting. The majority tells us that we should not worry about this disposition of rents because "[o]nce the city's rental obligation is reduced to zero, there is no debt, and if there is no debt, article XVI, section 18, is not implicated." (Maj. opn., *ante*, at p. 1489.) My colleagues repeat this theme when they state that during any reletting, the credit the city may realize against rent it owes is itself consideration for any continuing deficiency. (*Ibid.*) Taken literally these statements permit municipalities to incur long-term debt so long as they have some intention or plan to pay off the debt as it comes due. This of course is what the courts in *City of Palm Springs* v. *Ringwald*, *supra*, 52 Cal.2d at pages 626-627, and *Starr*, *supra*, 72 Cal.App.3d at pages 174-175, explicitly rejected.

This debt reduction as consideration theory, unsupported by any authority,[3] should have no part of California Constitution, article XVI, section 18 jurisprudence. With this theory the majority holds that debt can be incurred for the sole purpose of having that very same debt reduced. With due respect, this is circular reasoning. More importantly it is contrary to the teaching of *McBean*, *Offner* and *Dean* that debt can be incurred so long as the city will receive something—a few thousand acre-feet of water, a police car, a computer or simply the opportunity to occupy real property—in the same year in which the debt will arise.

The hazards posed by the majority's views on this issue cannot be overstated. Over the years the *Offner-Dean* doctrine has been subjected to some harsh and colorful criticism, which until today I could have easily dismissed as unwarranted and ill-informed. (See *Constitutionality of Chapter 280, Or. Laws 1975*, *supra*, 554 P.2d at p. 131 ["scheme that would only fool a lawyer"]; Kosel, *Municipal Debt Limitation in California* (1977) 7 Golden Gate L.Rev. 641, 653-654 ["the charade of lease-purchase financing"].) However the majority's theory of debt reduction as consideration lends these critics powerful new ammunition. With due respect, I fear the theory adopted today will subject the "pay-as-you-go" doctrine, so well articulated over the years, to relabeling as the doctrine of "now you see it, now you don't."

### 2. *Facility Lease Section 10.01(c)(3)*

The second serious violation of *Offner-Dean* principles occurs when the majority finds that during a reletting the city will receive some continuing consideration because the landlord will be bound to honor and perform the city's obligations to its subtenants and other contracting parties. (Maj. opn., *ante*, at pp. 1487-1488, 1489.)

---

[3]As I will explain in part C, under *County of Los Angeles* v. *Nesvig* (1965) 231 Cal.App.2d 603 [41 Cal.Rptr. 918] (*Nesvig*), which the majority cites, the reletting must be for the account of the tenant.

Although my colleagues rely repeatedly on the benefits the city would obtain because of the landlord's obligation to honor the third party contracts, they do not present any analysis of those supposed benefits. In particular the majority fails to address the question of whether the costs of meeting the third party obligations are to be assumed by the landlord or charged back to the city as a cost of reletting. In my opinion it is imperative that this question be addressed.

Section 10.01(c)(2)(B) of the facility lease states: "[T]the City hereby indemnifies and agrees to save harmless the Authority or its assignee from any *costs, loss or damage* whatsoever arising out of, in connection with, or incident to any retaking of possession of and re-letting of the Leased Property by the Authority or its assignee or its duly authorized agents in accordance with the provisions herein contained."

By its terms the hold harmless clause would permit the landlord to recover from the city any costs or liabilities it incurred in meeting the city's obligation to subtenants or third party contractors. Plainly, meeting the city's financial obligations to the third parties and then passing the costs of doing so on to the city, either by suing the city directly for the costs or deducting the costs from rents received on reletting, would not provide any new consideration or benefit to the city. The mere opportunity to pay the landlord in place of directly paying its obligees does not, within the meaning of the Constitution, provide the city with any consideration for a new debt.

In my opinion, analysis of the hold harmless clause substantially undermines the thesis advanced in the majority opinion. In light of the hold harmless clause it is clear the landlord's obligation to honor the third party contracts does not involve any cost shifting from the city to the landlord, but at most provides a mere condition restraining the landlord's conduct should it wish to recover rent by way of a reletting.[4] In finding continuing consideration in such conditions on the methods of collecting a debt, the majority gives us a corollary to its theory of "debt reduction as consideration"—and once again abandons *Offner-Dean* entirely.

One example suffices to demonstrate the potential for mischief in the majority's holding on this issue: if the city gives a bank a promissory note,

---

[4]In the end, the majority apparently agrees with this interpretation of the facility lease. The *only item of value the majority has been able to find in section 10.01(c)(3) is protection from* liability to the third parties. As I have noted, under the hold harmless clause, the cost of meeting the third party agreements will always remain with the city.

secured by a deed of trust on the stadium and due over a 20-year period, and the bank in return provides the city with $70 million in cash, the Constitution will be violated because payment over the 20 years will be for consideration received in a prior year. If however we add to the mortgage a provision which permits the bank to collect rents directly from stadium tenants on the condition the bank honor the city's agreements with those tenants, this condition on collection would, for the majority at least, provide ongoing consideration for any deficiencies owed to the bank after collecting rent. In both cases the loan payments would be for consideration received in a prior year, but in the latter variant the majority would find that the condition on collection saves the promissory note from constitutional infirmity. For the majority, it apparently would not matter that in this latter scenario payments from the city would be consideration received in a prior year or that the condition imposed on collection provides no new value to the city.

In sum, although until today it had been uniformly held that long-term municipal obligations required long-term receipt of consideration, my colleagues have now loosened that restraint and would permit municipalities to receive consideration in one year and pay for it in future years so long as conditions are imposed on the means of collecting the debt. In this regard the majority's later statement that "A party in breach of its contractual obligations cannot reasonably expect to continue to receive the full benefit of the bargain" (maj. opn., *ante*, at p. 1489) is not a reassuring portent. Just how minimal or slight a condition on collection of a debt will be sufficient to provide continuing consideration? Would a promise to evict subtenants only after giving some period of notice or an opportunity to negotiate with the landlord be sufficient? Under such analysis, perhaps a promise to indemnify the city for any loss resulting from such an eviction would be enough?

## C. *Alternatives*

The majority's attempt to honor the literal terms of the facility lease by foresaking the *Offner-Dean* doctrine is, frankly, overkill.

Although there can be little serious doubt the reletting permitted by facility lease section 10.01(c)(2) would deprive the city of any benefit or consideration during a reletting,[5] we can and should save the reletting clause from constitutional infirmity by simply finding portions of the reletting remedy unenforceable.

---

[5]In an article discussing reletting and reentry provisions and prepared for the California Law Review Commission, one commentator stated: "A clause appearing frequently in the leases involved in appellate cases provides that upon abandonment by the lessee, or after default by the lessee and eviction by the lessor, the lessor may reenter the property relet it as

In this regard I think it is significant to note that at common law if there was no express reletting clause in a lease, " 'Upon surrender of possession by the lessee before the expiration of the lease term, the lessor had three remedies: (1) to consider the lease as still in existence and sue for the unpaid rent as it became due for the unexpired portion of the term; (2) to treat the lease as terminated and retake possession for its own account; or (3) *to retake possession for the lessee's account and relet the premises, holding the lessee for the difference between the lease rentals and what it was able in good faith to procure by reletting.*' [Citation]. [¶] It is in connection with the third remedy enumerated above that most of the cases have arisen. The

'agent' for the defaulting lessee and hold the lessee responsible for any deficiencies resulting from the reletting.

" . . . . . . . . . . . . . . . . . . . . . . . . . .

"The cases involving agency-to-relet lease provisions reveal confusion as to the governing theory. It is clear that the lease is not surrendered and, therefore, the lessee's rental obligation and interest in the leasehold continues. But, even though the leasehold still 'belongs' to the lessee in theory, the lessor has the right to evict the lessee from the premises. And, in addition, there is language indicating that when the property is relet after the eviction the reletting is for the lessor's account, not the lessee's.

"*The 'agency to relet' is a fiction.* The lessor is not an agent of the lessee since the lessee has no right to direct or control the activities of the lessor—if he did, he could order the lessor to allow him back into the possession. As Justice Cardozo stated: 'The provision that the landlord may relet as the agent of the tenant after the termination of the lease does not mean that he is an agent in a strict sense. Plainly, he is not, for after the termination of the lease, what he relets is his own.' The case law confusion in theory and the fictional agency seem to derive from an underlying notion that damages for the loss of future rentals cannot be recovered unless the lease somehow continues in existence. This, of course, is a reflection of the common law conception of rent as an incident of the leasehold estate which ceases only upon termination of that estate. But *damages for the loss of the rental obligation is a contractual remedy. It is compensation for a lost obligation, not a recovery of a continuing obligation. As Justice Cardozo pointed out, the leasehold actually terminates when the lessee ceases to have any enforceable right to possession of the property.* What remains is merely a right to damages, and it is unnecessary to recognize any fictional interest of the lessee in a nonexistent estate to support that right of the lessor." (Harvey, *A Study To Determine Whether the Rights and Duties Attendant Upon the Termination of a Lease Should Be Revised* (1966) 54 Cal.L.Rev. 1141, 1176-1177, fns. omitted, italics added.)

In 1970 the Legislature largely adopted these recommendations and eliminated the requirement that the leasehold continue in order to recover future lost rent. (4 Witkin, Summary of Cal. Law, *supra*, Real Property, § 674, pp. 860-863.) In place of the requirement that the lease continue the Legislature permitted landlords to terminate the tenancy and sue the tenant for damages measured by the likely amount of lost future rent. (Civ. Code, § 1951.2) In the alternative, the landlord can allow the lease to continue to run, and so long as the landlord does not interfere with the tenant's right of possession, sue for rental payments as they arise. (Civ. Code, § 1951.4; 4 Witkin, Summary of Cal. Law, *supra*, Real Property, § 674, pp. 860-863.) In this scheme the agency to relet fiction is no a longer available to commercial landlords because possession by the landlord terminates the lease giving rise only to a cause of action for damages. (See *In re Lomax* (Bankr. 9th Cir. 1996) 94 Bankr. 862, 865-866.) By adopting the commission's recommendation, the Legislature clearly endorsed the commission's conclusion the agency to relet in lease provisions are fictions and that upon reentry by a landlord a tenancy is terminated.

landlord, upon an abandonment by the tenant, may retake possession of the premises on behalf of the tenant, relet the premises *for the tenant's account,* and hold the tenant for the difference." (*Dorcich, supra,* 103 Cal.App.2d at pp. 683-684, italics added.)

In my view, if the reletting set forth in the facility lease were consistent with the common law principles articulated in *Dorcich,* the Constitution would not be offended.[6] Under these common law principles, a reletting for the account of the tenant permits the tenant to enjoy, if not the actual possession of the premises, its economic value. More importantly, I think it is plain that it was these common law limitations which the court in *Nesvig, supra,* 231 Cal.App.2d at page 612 was, sub silentio, relying upon when it stated: "In the event this right of reentry were exercised, either the leaseback would be declared terminated and the county's obligation to pay further rent would end, or the bidder would repossess the property and relet it for *the county's account.* In the latter event the county's obligation would continue to accrue from year to year accordance with the contract and it would continue to receive the value of the use of the property from year to year in the form of credits against its obligation." (*Ibid.*)

As elegantly as these well-defined limits on a reletting landlord's rights work with the limits of the Constitution, the majority abandons them in favor of the literal terms of the lease. As my previous discussion of the violations of *Offner-Dean* principles indicates, the most difficult provision for the majority is facility lease section 10.01(c)(2)(D) by which the city assigns to the financing authority any rent the authority receives in excess of the rent due under the lease and the costs of reletting. Obviously if, as *Nesvig* instructs, a reletting must be for the account of a municipal tenant, this disposition of excess rent cannot be enforced. Plainly in such a situation, as Justice Cardozo noted,[7] the reletting is in no sense for the account or benefit of the tenant. (Harvey, *A Study To Determine Whether the Rights and Duties Attendant Upon the Termination of a Lease Should Be Revised, supra,* 54 Cal.L.Rev. at p. 1177.)

At this point in the analysis I would jettison the offending portion of the reletting remedy rather than *Nesvig.* My colleagues' analysis, however, is not so anchored to the language of the court in *Nesvig* or the circumstances that

---

[6]Indeed in its latest brief the city suggested as much. The city argued that we could interpret the reletting clause in the facility lease as providing the remedies now available under Civil Code section 1951.4. Like the limitations set forth in *Dorcich,* under Civil Code section 1951.4 the tenant continues to receive the economic value of the lease even if a receiver must be imposed to preserve the landlord's interest. (See Civ. Code, § 1951.4, subd. (b).)

[7]See footnote 5, *ante.*

court was considering. As I have explained, the majority has instead created a new theory, i.e., that debt reduction will serve as consideration, and a corollary that limitations on debt collection practices are of continuing benefit to a debtor.

As opposed to undermining the otherwise durable and useful *Offner-Dean* doctrine, I would simply find that the disposition of excess profits under the lease is unenforceable[8] and that the lease otherwise meets the requirements of *Offner*, *Dean* and *Nesvig*. As so modified,[9] I would affirm the judgment.

Appellants' petition for review by the Supreme Court was denied October 16, 1996. Kennard, J., and Chin, J., were of the opinion that the petition should be granted.

---

[8]Likewise I believe section 10.01(c)(2)(E) of the facility lease, the alteration and repair provision, runs afoul of the Constitution. I would find that the only circumstances under which the alteration and repair provisions may be enforced will occur when the repairs or alterations are commenced in the same fiscal year in which the landlord gives the required notice of completion.

[9]I note the city has expressed concern that because similar provisions appear in any number of other lease-back transactions, any holding finding particular parts of this lease invalid would undermine the stability of a number of public projects. We should forthrightly reject this concern. The errors of other municipalities and governmental agencies do not relieve us of our duty to interpret and apply the Constitution in this case consistent with principles established by our Supreme Court. Moreover the threat to the stability of other transactions is for the most part illusory. As the Supreme Court noted in *Rider* v. *County of San Diego, supra,* 1 Cal.4th at page 13, in addition to the power we have to make any such determination solely prospective, Code of Civil Procedure sections 860 and 863 provide a 60-day statute of limitations for actions challenging the validity of financing schemes such as this. "[S]uch statutes of limitations are deemed within legislative power to provide a prompt validating procedure for asserting such challenges." (*Rider* v. *County of San Diego, supra,* 1 Cal.4th at p. 13.)